**IRAN AIRCRAFT INDUSTRIES and Iran Helicopter Support and Renewal Company, Petitioners–Appellants,**

**v.**

**AVCO CORPORATION, Respondent–Appellee.**

**No. 29, Docket 92–7217.**

United States Court of Appeals, Second Circuit.

Argued Sept. 29, 1992.

Decided Nov. 24, 1992.

Bruno A. Ristau, Washington, D.C. (Ristau & Abbell, of counsel), for petitioners-appellants.

Brice M. Clagett, Washington, D.C. (Covington & Burling, Peter D. Trooboff, David H. Resnicoff, of counsel), for respondent-appellee.

Before: MESKILL, Chief Judge, LUMBARD, and CARDAMONE, Circuit Judges.

LUMBARD, Circuit Judge:

Iran Aircraft Industries and Iran Helicopter Support and Renewal Company (collectively the "Iranian parties"), both agencies and instrumentalities of the Islamic Republic of Iran, appeal from the December 10, 1991 order of the District Court for the District of Connecticut, Daly, *J.*, granting defendant Avco Corporation's motion for summary judgment.

In granting Avco's motion, which was not timely opposed by the Iranian parties, the district court declined to enforce an award of the Iran–United States Claims Tribunal which resulted in a net balance of $3,513,086 [1] due from Avco to the Iranian parties (the "Award"). The Iranian parties argue that the district court erred in declining to enforce the Award because, as claimed by the Iranian parties, the Tribunal's awards are "directly" enforceable in United States courts. In the alternative, the Iranian parties contend that the Award is enforceable under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517 (the "New York Convention"). Because we find that the district court properly denied enforcement of the Award, we affirm.

Beginning in 1976, Avco entered into a series of contracts whereby it agreed to repair and replace helicopter engines and related parts for the Iranian parties. After the Iranian Revolution of 1978–79, disputes arose as to Avco's performance of, and the Iranian parties' payments under, those contracts. On January 14, 1982, the parties' disputes were submitted to the Tribunal for binding arbitration.

The Tribunal was created by the Algiers Accords (the "Accords"), an agreement between the United States and Iran, through the mediation of Algeria, which provided for the release of the 52 hostages seized at the American Embassy in Tehran on November 4, 1979.[2] In addition to providing

---

1. This figure includes pre-award, but not post-award interest.

2. The Algiers Accords comprised principally two documents: The Declaration of the Government of the Democratic and Popular Republic of Al-geria (Jan. 19, 1981) (the "General Declaration"), and The Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of

conditions for the release of the hostages,[3] the Accords established the Tribunal to serve as a forum for the binding arbitration of all existing disputes between the governments of each country and the nationals of the other. Accordingly, the Tribunal was vested with exclusive jurisdiction over claims by nationals of the United States against Iran, claims by nationals of Iran against the United States, and counterclaims arising from the same transactions.[4] *See* Claims Settlement Declaration, Art. II(1).

On May 17, 1985, the Tribunal held a prehearing conference to consider, *inter alia,* "whether voluminous and complicated data should be presented through summaries, tabulations, charts, graphs or extracts in order to save time and costs." *See Avco Corp. v. Iran Aircraft Indus.,* Case No. 261, 19 Iran–U.S.Cl.Trib.Rep. 200, 235 (1988) (Brower, *J.,* concurring and dissenting). At the conference, Avco's counsel, Dean Cordiano, requested guidance from the Tribunal as to the appropriate method for proving certain of its claims which were based on voluminous invoices, stating:

> In the interest of keeping down some of the documentation for the Tribunal we have not placed in evidence as of yet the actual supporting invoices. But we have those invoices and they are available and if the Tribunal would be interested in seeing them we can obviously place them in evidence or we can use a procedure whereby an outside auditing agency, uh, certifies to the amounts of the, uh, sum-

maries vis-a-vis the underlying invoices. Both of those approaches can be taken. But I want to assure the Tribunal that all of the invoices reflected in our exhibits to the memorial ... exist and are available.

*Id.* at 235–36. After noting that the Iranian parties "obviously have had those invoices all along," Cordiano stated that he would:

> like the Tribunal's guidance as to whether, uh, you would like this outside certifying agency to go through the underlying invoices and certify as to the summary amounts or that the Tribunal feels at this point that the, uh—that you would rather have the, uh, raw data, so to speak—the underlying invoices. Uh, we're prepared to do it either way.

*Id.* at 236.

The Chairman of Chamber Three,[5] Judge Nils Mangard of Sweden, then engaged in the following colloquy with Cordiano:

> Mangard: I don't think we will be very, very much enthusiastic getting kilos and kilos of invoices.
>
> Cordiano: That, that's what I thought so ...
>
> Mangard: So I think it will help us ...
>
> Cordiano: We'll use ...
>
> Mangard: To use the alternative rather.
>
> Cordiano: Alright ...
>
> Mangard: On the other hand, I don't know if, if any, if there are any objections to any specific invoices so far made by the Respondents. But any-

Iran (Jan. 19, 1981) (the "Claims Settlement Declaration"), *reprinted in* 20 I.L.M. 223 (1981); Dept. of State Bull. No. 2047, Feb. 1981 at 1; 1 Iran–U.S.Cl.Trib.Rep. 3 (1983). *See also United States v. Sperry Corp.,* 493 U.S. 52, 55–56, 110 S.Ct. 387, 391, 107 L.Ed.2d 290 (1989) (describing background and operation of Algiers Accords); *Ministry of Defense of the Islamic Republic of Iran v. Gould, Inc.,* 887 F.2d 1357, 1358–60 (9th Cir.1989) (same), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1319, 108 L.Ed.2d 494 (1990).

**3.** The Accords provided that upon the release of the American hostages, the United States would permit the return to Iran of some $12 billion in Iranian assets frozen in the United States and abroad by President Carter's Executive Order. *See* Exec. Order No. 12,170, 3 C.F.R. 457 (1980).

**4.** The Tribunal was also vested with jurisdiction to hear "official claims of the United States and Iran against each other arising out of contractual arrangements between them for the purchase and sale of goods and services," and "dispute[s] as to the interpretation or performance of any provision" of the General Declaration. Claims Settlement Declaration, Art. II(2)–(3).

**5.** Pursuant to the procedure mandated by the Accords, the claim was heard by a "Chamber" or panel of three arbitrators: one from Iran, one from the United States, and one from a group of arbitrators from other countries selected by mutual agreement of Iran and the United States. *See* Claims Settlement Declaration, Art. III(1).

how as a precaution maybe you could ...

Cordiano: Yes sir.

Mangard: Get an account made.

*Id.* at 236. Neither counsel for the Iranian parties nor the Iranian Judge attended the pre-hearing conference.

On July 22, 1985, Avco submitted to the Tribunal a Supplemental Memorial, which stated in part:

> In response to the Tribunal's suggestion at the Prehearing Conference, Avco's counsel has retained Arthur Young & Co., an internationally recognized public accounting firm, to verify that the accounts receivable ledgers submitted to the Tribunal accurately reflect the actual invoices in Avco's records.

Attached to the Supplemental Memorial was an affidavit of a partner at Arthur Young & Co. which verified that the accounts receivable ledgers submitted by Avco tallied with Avco's original invoices, with the exception of one invoice for $240.14. *Id.* at 237.

The Tribunal held its hearing on the merits on September 16–17, 1986. By that time, Judge Mangard had resigned as Chairman of Chamber Three and had been replaced by Judge Michel Virally of France. At the hearing, Judge Parviz Ansari of Iran engaged in the following colloquy with Cordiano:

> Ansari: May I ask a question? It is about the evidence. It was one of the first or one of the few cases that I have seen that the invoices have not been submitted. So what is your position on this point about the substantiation of the claim?
>
> Cordiano: Your Honor, this point was raised at the pre-hearing conference in May of last year.
>
> Ansari: I was not there.
>
> Cordiano: I remember that you weren't there. I think we were kind of lonely that day. We were on one side of the table, the other side was not there ... We could have produced at some point the thousands of pages of invoices, but

we chose to substantiate our invoices through ... the Arthur Young audit performed specifically for this tribunal proceeding.

*Id.* at 237.

The Tribunal issued the Award on July 18, 1988. Of particular relevance here, the Tribunal disallowed Avco's claims which were documented by its audited accounts receivable ledgers, stating, "[T]he Tribunal cannot grant Avco's claim solely on the basis of an affidavit and a list of invoices, even if the existence of the invoices was certified by an independent audit." *Id.* at 211 (majority opinion).

Judge Brower, the American judge and the only judge of the panel who was present at the pre-hearing conference, filed a separate Concurring and Dissenting Opinion in which he stated:

> I believe the Tribunal has misled the Claimant, however, unwittingly, regarding the evidence it was required to submit, thereby depriving Claimant, to that extent, of the ability to present its case ...

\* \* \* \* \* \*

> Since Claimant did exactly what it previously was told to do by the Tribunal the denial in the present Award of any of those invoice claims on the ground that more evidence should have been submitted constitutes a denial to Claimant of the ability to present its case to the Tribunal.

*Id.* at 231, 238.

## A. "Direct" Enforceability of the Award

▮▮ The Iranian parties contend that the district court erred in refusing to enforce the Award because the Tribunal's awards are "directly" enforceable in United States courts, irrespective of the defenses to the enforcement of foreign arbitral awards provided for in the New York Convention. The Iranian parties do not, and cannot, point to any mechanism in the Accords for direct enforcement of Tribunal awards issued against United States nationals.[6] Nevertheless, the Iranian parties

---

6. In contrast, the Accords provided that approxi-      mately $1 billion of the previously frozen Irani-

argue that Tribunal awards must be "directly" enforced because the Accords state that "All decisions and awards of the Tribunal shall be final and binding." *See* Claims Settlement Declaration, Art. IV(1).

The Tribunal's own interpretation of the Accords reveals the lack of merit in the Iranian parties' position. In *Islamic Republic of Iran v. United States*, Case No. A/21, 14 Iran–U.S.Cl.Trib.Rep. 324 (1987), the Tribunal considered whether the Accords obligated the United States to satisfy awards issued in favor of Iran or its nationals upon the default of United States nationals. The Tribunal ruled that while the United States had no such obligation under the Accords, it had assumed a treaty obligation to provide an enforcement mechanism for the Tribunal's awards, stating:

> It is therefore incumbent on each State Party to provide some procedure or mechanism whereby enforcement may be obtained within its national jurisdiction, and to ensure that the successful Party has access thereto. If procedures did not already exist as part of the State's legal system they would have to be established, by means of legislation or other appropriate measures. Such procedures must be available on a basis *at least as favorable* as that allowed to parties who seek recognition or enforcement of foreign arbitral awards.

*Id.* at 331 (emphasis added). Accordingly, the Accords require only that we grant the Award "at least as favorable" treatment as we grant other "final and binding" foreign arbitral awards.

The Iranian parties argue that where parties agree to "final" or "binding" arbitration, the resulting arbitral award must be treated as a final, res judicata judgment against the non-prevailing party. We disagree. The terms "final" and "binding" merely reflect a contractual intent that the issues joined and resolved in the arbitration may not be tried de novo in any court. *See I/S Stavborg v. National Metal Converters, Inc.*, 500 F.2d 424, 427 (2d Cir.1974). Furthermore, we have held that even a "final" and "binding" arbitral award is subject to the defenses to enforcement provided for in the New York Convention. *See Fotochrome, Inc. v. Copal Co., Ltd.*, 517 F.2d 512, 519 (2d Cir.1975).[7] Accordingly, the "final and binding" language in the Accords does not bar consideration of the defenses to enforcement provided for in the New York Convention.

## B. *The New York Convention*

■ Avco argues that the district court properly denied enforcement of the Award pursuant to Article V(1)(b) of the New York Convention because it was unable to present its case to the Tribunal. The New York Convention provides for nonenforcement where:

> The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was *otherwise unable to present his case* ...

New York Convention, Art. V(1)(b) (emphasis added).

We have recognized that the defense provided for in Article V(1)(b) "essentially sanctions the application of the forum state's standards of due process," and that due process rights are "entitled to full force under the Convention as defenses to enforcement." *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de*

an assets would be placed in a "Security Account" from which the United States or its nationals who prevailed on claims against Iran would be able to satisfy their awards. Iran agreed to maintain a minimum balance of $500 million in the Security Account until all awards of the Tribunal are paid. General Declaration, Sec. 7.

**7.** *Accord International Standard Electric Corp. v. Bridas Sociedad Anonima Petrolera, Industrial y Comercial*, 745 F.Supp. 172 (S.D.N.Y.1990) (New York Convention defenses considered with regard to "final[ ]" arbitral award); *Sesotris, S.A.E. v. Transportes Navales, S.A.*, 727 F.Supp. 737, 741 (D.Mass.1989) (declining to enforce "final" arbitral award pursuant to Article V(1)(b) of the New York Convention); *Al Haddad Bros. Enterprises, Inc. v. M/S AGAPI*, 635 F.Supp. 205 (D.Del.1986) (considering New York Convention defenses with regard to "final and binding" arbitral award), *aff'd*, 813 F.2d 396 (3d Cir.1987); *Biotronik Mess-und Therapiegeraete GmbH & Co. v. Medford Medical Instrument Co.*, 415 F.Supp. 133 (D.N.J.1976) (same).

*L'Industrie du Papier (RAKTA)*, 508 F.2d 969, 975–76 (2d Cir.1974). Under our law, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). Accordingly, if Avco was denied the opportunity to be heard in a meaningful time or in a meaningful manner, enforcement of the Award should be refused pursuant to Article V(1)(b).

At the pre-hearing conference, Judge Mangard specifically advised Avco not to burden the Tribunal by submitting "kilos and kilos of invoices." Instead, Judge Mangard approved the method of proof proposed by Avco, namely the submission of Avco's audited accounts receivable ledgers. Later, when Judge Ansari questioned Avco's method of proof, he never responded to Avco's explanation that it was proceeding according to an earlier understanding. Thus, Avco was not made aware that the Tribunal now required the actual invoices to substantiate Avco's claim. Having thus led Avco to believe it had used a proper method to substantiate its claim, the Tribunal then rejected Avco's claim for lack of proof.

We believe that by so misleading Avco, however unwittingly, the Tribunal denied Avco the opportunity to present its claim in a meaningful manner. Accordingly, Avco was "unable to present [its] case" within the meaning of Article V(1)(b), and enforcement of the Award was properly denied.

Affirmed.

CARDAMONE, Circuit Judge, dissenting:

The issue before us is whether Avco was denied an opportunity to present its case before the Iran–United States Claims Tribunal at the Hague. To rule, as the majority does, that it was denied such an opportunity renders the Tribunal's award unenforceable under article V(1)(b) of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517 (the New York Convention). I respectfully dissent because it seems to me that a fair reading of this record reveals that Avco was not denied such an opportunity. Thus, in my view the arbitral award is enforceable under the New York Convention.

I

Avco's focus is on a pre-trial colloquy between its counsel and Judge Mangard of the Tribunal regarding the use of summaries in place of some of the invoices Avco needed to prove its claim. Judge Mangard stated the panel would not be very "enthusiastic about getting kilos and kilos of invoices," and added that there appeared to be no objection to using summaries of certain invoices, and suggested to counsel that "as a precaution" Avco might get an account summary made. Based on this brief exchange, Avco now makes the dubious argument that this colloquy constituted a binding pre-trial ruling by the Tribunal that summaries of those particular invoices could substitute for the invoices and would be sufficient evidence at trial.

At the time of trial Judge Mangard was no longer a member of the Tribunal. Another judge who was present at the pre-trial had also been replaced. The three-judge panel hearing the case retained therefore only one of the original judges present at the pre-trial exchange. These trial judges had different concerns than had the earlier panel. One of the new judges, Judge Ansari, questioned the adequacy of Avco's proof based only on summaries of invoices. He noted that it was "the first or one of the few cases" he had heard of in which none of the invoices were produced as evidence. In response, Avco's counsel stressed the massive number of invoices involved, mentioning that Avco "*chose* to substantiate [the] invoices through other methods," and stated, "we simply *chose* not to put in thousands of pages of documents." (emphasis added.) Concluding that Avco's proof did not establish its claim, the Tribunal declined to grant

Avco an award based only on summaries of its invoices.

## II

The New York Convention obligates U.S. courts to enforce foreign arbitral awards unless certain defenses provided in article V(1) of the Convention are established. The specific defense with which we deal in the case at hand appears in article V(1)(b). That section states that enforcement of an arbitral award may be denied if the court is satisfied that the party against whom the award is sought to be enforced was unable to present its case before the arbitration panel.

Based on the facts before us, Avco fails to meet the legal standard of being unable to present its case before the arbitral Tribunal so as to render the award unenforceable under the New York Convention. That standard, as the majority points out, essentially involves a due process inquiry to see whether the party against whom enforcement is sought has been put on notice and has had an opportunity to respond. See Parsons & Whittemore Overseas Co. v. Societe Generale de l'Industrie du Papier (RAKTA), 508 F.2d 969, 975–76 (2d Cir.1974). Unfortunately, only limited case law exists on this issue, and those cases that can be found merely note, in applying article V(1)(b), that due process serves as an interpretive guide.

One of the reasons for this dissent is because until today no federal or foreign case appears to have used article V(1)(b)'s narrow exception as a reason to refuse to enforce an arbitral award due to the arbitration panel's failure to consider certain evidence. Moreover, some decisions have rejected the article V(1)(b) defense under other, somewhat analogous circumstances. For example, in Parsons & Whittemore Overseas Co., 508 F.2d at 975–76, we refused to use the defense to bar enforcement based on an arbitral Tribunal's refusal to accommodate a key witness' schedule, stating that the inability to present one's witness was "a risk inherent in an agreement to submit to arbitration." Similarly, another court has held that a party was not denied the opportunity to present its defenses under article V(1)(b) when it had notice of an arbitration, but chose not to respond. See Goetech Lizenz AG v. Evergreen Systems, 697 F.Supp. 1248, 1253 (E.D.N.Y.1988). The court in Evergreen Systems ruled that the defendant's "failure to participate was a decision that was reached only after the Company had full knowledge of the peril at which it acted." Id. In the face of Judge Ansari's repeated questioning of Avco's counsel, Avco was plainly placed on similar notice of the possible risk that the panel would choose not to rely on invoice summaries in determining whether to grant it an award.

Further support for finding that Avco was not denied due process arises from a like exception to enforceability that appears in the Federal Arbitration Act, 9 U.S.C. § 10 (1988). That Act also provides an exception to enforcement for the inability to present one's case at arbitration. The more extensive case law available under § 10 supports the conclusion that Avco was not denied due process before the Iran–U.S. Claims Tribunal. Avco's protests that the events in this case were more "egregious" than in other cases involving the inability to present one's case at arbitration are unpersuasive. The ruling by the Hague Tribunal in the instant matter was not high-handed or arbitrary as are those cases, upon which Avco relies, arising under the Federal Arbitration Act. A reading of those cases reveals that they either involve arbitration hearings actually cut short and not completed before an award was rendered, see Confinco, Inc. v. Bakrie & Bros, N.V., 395 F.Supp. 613, 615 (S.D.N.Y.1975); Teamsters, Local Union No. 506 v. E.D. Clapp Corp., 551 F.Supp. 570, 577–78 (N.D.N.Y.1982), aff'd, 742 F.2d 1441 (2d Cir.1983), or a panel's outright refusal to hear certain relevant evidence at all, see Harvey Aluminum Inc. v. United Steelworkers, 263 F.Supp. 488, 493 (C.D.Cal.1967).

The present picture is vastly different. Avco had a full opportunity to present its claims, and was on notice that there might be a problem with its proof, especially giv-

en Judge Ansari's concerns voiced at trial. The earlier panel surely had never said that the invoices themselves would not be accepted or considered as evidence at trial. Nor did the pre-trial colloquy clearly indicate that the earlier panel had issued a definitive ruling that account summaries would be sufficient substitute proof for the invoices. Avco did not declare, after hearing Judge Ansari's comments, that it had been precluded by the pre-trial colloquy from producing the invoices, nor did it then attempt to introduce them before the panel. Rather than address Judge Ansari's concerns through producing the invoices themselves, Avco reiterated its "choice" to produce only a summary of the invoices. In so doing it took a calculated risk. Under these circumstances, Avco can scarcely credibly maintain that it was prevented from presenting its case before the Tribunal.

### III

When reviewing the grant of summary judgment which dismissed the action to enforce the award, we must view the facts in the light most favorable to the Iranian parties. When so viewed those facts fail to demonstrate that Avco was denied the opportunity to present its claims to the Tribunal. For the reasons stated I think the district court erred in reaching the opposite conclusion. Accordingly, I dissent and vote to enforce the award.