**GENERICA LIMITED,**
**Plaintiff–Appellee,**

v.

**PHARMACEUTICAL BASICS, INC.,**
**Defendant–Appellant.**

**No. 96–4004.**

United States Court of Appeals,
Seventh Circuit.

Argued May 19, 1997.

Decided Sept. 29, 1997.

**1124**

Patricia Susan Spratt, James D. Wilson, Shefsky, Froelich & Devine, Chicago, IL, George A. Borden (argued), Gerson A. Zweifach, Michael R. Pompeo, Williams & Connolly, Washington, DC, for Plaintiff–Appellee.

William J. Linklater, Baker & McKenzie, Chicago, IL, Jonathan D. Schiller, Randall L. Speck (argued), Kaye, Scholer,Fierman, Hays & Handler, Washington, DC, for Defendant–Appellant.

Before RIPPLE, KANNE and DIANE P. WOOD, Circuit Judges.

RIPPLE, Circuit Judge.

The litigation before us arises from a final arbitral award issued in August 1995 by an arbitrator of the International Court of Arbitration. The award concluded that Pharmaceutical Basics, Inc. ("PBI") had breached and repudiated its contract with Generica Limited ("Generica"). It granted to Generica $6,621,628 in damages and £392,482 in apportioned costs. In the district court, Generica filed a petition for an order confirming the foreign arbitral award and for judgment on the confirmed order. PBI responded with a cross-petition to vacate the award. The district court issued a final judgment confirming the award and denying PBI's cross-petition. *See* Fed. R. Civ. P. 54(b). PBI now appeals to this court, seeking a vacation of the arbitration award on the ground that the award may not be enforced under Article V of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), 9 U.S.C. §§ 201 *et seq.* For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. *Facts*

The dispute in this case arises out of a contract between Generica and PBI. On December 20, 1989, the two parties entered into an "Agreement for Pharmaceutical Development, Manufacturing and Marketing of Clomiphene Citrate" (the "Agreement") that "called for Generica and PBI to cooperate in the development, regulatory approval, manufacturing and marketing of clomiphene citrate and to share in the profits therefrom." R.1 ¶ 1. Clomiphene citrate ("CC") is a pharmaceutical drug widely used in the treatment of anovulatory infertility in women; it was first marketed under the brand name "Clomid" in about 1961.

Some background to this Agreement is helpful. In about 1986 a British company named Hogens Ltd. was created by Dr. Richard Wiseman for the purpose of developing and producing CC in the United Kingdom. However, because it was not a manufacturer, Hogens turned to Athlone Laboratories ("Athlone"), a manufacturing company in the Republic of Ireland, to carry out the formulation and laboratory testing of CC. The managing director of Athlone was Tony Hynds. On the basis of Athlone's production, in 1989 Hogens obtained product licenses or their equivalent in the UK, Germany, the Republic of Ireland, and the Grand Duchy of Luxembourg. Interested in penetrating the American market, Dr. Wiseman and another individual formed Generica in March 1989 to develop and manufacture CC in the United States. They needed to find a manufacturer that was approved by the Federal Drug Administration ("FDA") and that could perform the stability testing and "bio-equivalent study" required by the FDA for approval of such a product. R.1, Ex.2 ("Interim Award") at 3–4. Eventually, as the result of a recommendation, Dr. Wiseman contacted PBI as a suitable manufacturer. After months of negotiations, PBI agreed to undertake the manufacture and testing of the hormone product in the United States for Generica.

Under the Agreement, Generica granted to PBI all the rights to manufacture and market the fertility drug, including rights to the manufacturing formula and procedures relating to the product. PBI agreed to perform the required pharmaceutical development and to test both the raw material and the finished product of CC for FDA approval. The parties agreed to conduct the required bioavailability study for FDA approval as soon as possible and to cooperate with each other "in all respects in their joint efforts to complete [the required] bioavailability study and to file an Abbreviated New Drug Application (ANDA)" with the FDA. R.1, Ex.1 ¶ 4(ii), (iii). PBI also agreed to manufacture a pilot batch, 100,000–150,000 tablets, of CC. The Agreement was to be interpreted in accordance with English law and any dispute arising from the Agreement was to be submitted to the arbitration of the International Chamber of Commerce ("ICC").

PBI began its initial development testing by creating a small 6,000–tablet test batch of CC using Generica's formula and procedures. It found that the consistency of the product was moist and sticky, like bread dough; however, when PBI expressed concern to Generica, Generica confirmed the "bread dough" consistency of its granulation. PBI next proceeded to manufacture a 100,000–tablet batch, the quantity needed to assess the bioavailability of the drug for FDA approval.[1] PBI performed the required analytical tests and compiled a draft ANDA for the FDA's consideration. The biostudy was complete by September 1991; PBI's Vice President of Research and Development and Regulatory Affairs wrote Dr. Wiseman that the "results certainly do suggest bioequivalence to Clomid." R.1, Ex.2 at 21. The draft ANDA was finalized in mid–1992.

---

1. A bioavailability or bioequivalence study is intended to establish that the properties of the new product are for all relevant purposes equivalent to those of the established referent drug in the United Kingdom. Although the aim of this type of study is to "eliminate an examination of the new product from scratch," the study still is "an expensive, timeconsuming exercise ... [that] involves, among other things, clinical trials on volunteer patients over a period of some months." R.1, Ex.2 at 12–13.

At this point, however, the parties disagree about how the dispute and eventual dissolution of their relationship occurred. From PBI's perspective, its managers continued to be concerned about the "bread dough" consistency of Generica's formulation and about their ability to control the process. According to PBI, this concern caused PBI's president to advise Generica in September 1992 that the validation difficulties made FDA approval impossible without reformulation of the product and repetition of the bioequivalence study. Although PBI offered to undertake that reformulation, PBI claimed that Generica refused to proceed with the project.

Generica's description of the events is quite different. It had been told in September 1991 by PBI's vice president that the test results "certainly do suggest bioequivalence," *id.*, and that PBI would be in touch shortly to discuss the ANDA application. Then Generica heard nothing. PBI's new president, who had not been involved with the Agreement, at some point told Generica's Dr. Wiseman that the Agreement was "a deal I would not have done" because it was too favorable to Generica; he did not respond to Generica's calls and letters and refused to meet. *Id.* at 21–22. Although PBI finalized its draft ANDA in mid–1992, when the parties met in September 1992, PBI's president told Dr. Wiseman that the ANDA was "not fileable" or "could not be approved by the FDA" and that PBI would not submit the ANDA as it then stood. *Id.* at 26. He stated that FDA approval was impossible without reformulation of the product and repetition of the bioequivalence study. According to Generica, PBI had never before claimed that the consistency of the granulation would prevent approval of the CC. By early March 1993, it was clear that the Agreement was at an end. On March 9, Generica demanded payment from PBI; no payment was made.

On April 20, 1993, pursuant to the Agreement's arbitration clause, Generica filed a request for arbitration to the ICC. Generica alleged that PBI had breached the Agreement by failing to "procure the required pharmaceutical development" and failing to move toward FDA approval of the product. *Id.* at 29. PBI denied the breach; it responded that the formulation and processes supplied by Generica were so flawed for use in the United States that FDA approval was not practicable, even with further pharmaceutical development.

B. *The Arbitration*

1.

At a session of the International Court of Arbitration on August 18, 1993, English barrister Howard Page, Q.C., was appointed as sole arbitrator. The arbitrator and the parties established Terms of Reference, which incorporated an agreed set of "Applicable Procedural Rules" for the arbitration. Of particular interest to this review were the following provisions:

6. Admissibility, form and weight of evidence

6.1 It shall be for the Arbitrator, in his discretion, to decide what evidence to admit and in what form evidence is to be tendered.

6.2 The weight to be given to any particular evidence shall be a matter for the judgment of the Arbitrator.

R.9 at 20. During discovery, PBI received from Generica many documents, among which were the batch records from Athlone, the Irish company that manufactures CC in the United Kingdom for Generica. Prior to the hearing on liability, the parties tendered witness statements and expert reports to the arbitrator. The arbitration hearing was held in Paris from May 16 to May 24, 1994. Generica presented five witnesses; PBI presented six witnesses and showed a video tape. Both sides submitted extensive documentation; the materials included records of PBI's production of two batches of CC tablets and records of Athlone's production of its batches. Following the hearing, the parties filed briefs and made closing arguments over two days. The parties submitted to the arbitrator voluminous documents, statements and reports.

On November 18, 1994, the arbitrator issued his extensive interim award concerning liability. In the "Conclusions of Law and Fact" section, the arbitrator concluded that the Agreement between PBI and Generica

contained no implied term that Generica's formulation and process would be capable of FDA approval. He also stated that he had "no hesitation in rejecting PBI's contention that Generica's formulation and processes were not amenable to FDA approval even with pharmaceutical development within the meaning of Clause 4(I) of the Agreement."[2] R.1, Ex.2 at 70. The arbitrator described as unfounded PBI's claim that the draft ANDA was unfileable because of Generica's deficient formulation and processes. He concluded:

> The true reason for the stance adopted by PBI was either that it had failed to perform its own obligations under the Agreement or that it was unwilling for extraneous reasons to proceed further with the Agreement or a combination of the two.

*Id.* at 74. In the interim award, the arbitrator concluded that PBI had breached and repudiated several clauses in the Agreement by failing to carry out the pharmaceutical development and by failing to cooperate with Generica. In the final award he resolved the issue of damages and costs caused by the breach.

### 2.

Because the sole issue on appeal concerns the cross-examination of Tony Hynds, we set forth the facts concerning his appearance as a witness in the arbitral hearing. Tony Hynds was the Director of Athlone, Generica's U.K. manufacturer of the fertility drug. He had submitted a four-page written statement in which he described the procedure for manufacturing consistent, uniform CC tablets and reported that, of the fifteen batches made since 1989, "we have never had any problem in manufacture" and "all of the batches have been completed in accordance with the specification." R.9 at 100. On the second day of the arbitral hearing, Generica called Hynds briefly as a witness.[3] PBI then cross-examined Hynds extensively concerning the development of the Athlone formulation, the license application for producing the product in the United Kingdom, and the process for manufacturing the tablets. Hynds described the granulation of the mix-

---

**2.** Among the arbitrator's conclusions were these:
(3) There is no good reason to suppose that the formulation and process provided by Generica under the Agreement ... were not capable of forming the basis of an ANDA that was amenable to FDA approval at any point in time material to this dispute.
(4) If PBI did in 1990 experience what they perceived to be any difficulties with, or harboured any reservations about, the viability of the formulation and process provided by Generica
  (a) such matters were not of any great consequence[;]
  (b) they were not made known to Generica by anyone on behalf of PBI in January or February 1990 or at any stage prior to the meeting of 23rd September 1992;
  (c) they would, if tackled sensibly and expeditiously by PBI, have been capable of resolution within the parameters of the Agreement in 1990 or at least before the U.S. bioequivalence study had started or got very far and would not have constituted any significant impediment to the project.
(5) The fact that Generica did not, in the event, supply PBI with copies of the batch records for a commercial-size batch of tablets produced by Athlone as requested by PBI in early 1990 and/or other information, even if it were technically a breach of the Agreement by Generica (which in my view it was not: see (6) below), was of little if any consequence to the course of the project or the issues in this arbitration. It

is wholly improbable that their production would have caused PBI to act in any way significantly different from that in which it did in fact act.
(6) In the context of a contract of the kind represented by the Agreement and the circumstances of PBI's request and Generica's response, the fact that the Athlone batch records ... were not made available to PBI cannot fairly be regarded as a breach of the Agreement by PBI. In particular there cannot either in this respect or in any other be said to have been any failure by Generica to cooperate with or to assist PBI ....
R.1, Ex.2 at 73–74.

**3.** Prior to Hynds' appearance, the arbitrator concluded that PBI had changed its theory of the case it was presenting. He asked PBI to present a written statement explaining what its case was at that point. That evening PBI submitted a supplemental statement. It stated that PBI had reasonable expectations that Generica's formulation and manufacturing processes had been validated under proper control methods. It then alleged that Athlone's batch records contradicted that belief in proper validation. It alleged that "the batches produced by Athlone have not been controlled" and that its "results are indicative of a process that cannot be adequately controlled and would be unacceptable to the FDA without a complete reformulation of the Generica formulation and processes." R.9 at 41.

ture as a "moist mass" like bread dough, "a smooth mass of a wet powder which can be spread evenly on a tray for drying." R.5 at 16.

When the hearings were reconvened on the third day, PBI wanted to reopen cross-examination of Hynds to challenge Hynds' testimony that Athlone's batches of CC produced consistent, reproducible, properly validated results. PBI sought to elicit from Hynds that Athlone had in fact not been able to manufacture uniform product using Generica's formula and process. However, the arbitrator was unwilling to permit the cross-examination. At the hearing, he explained:

> I do not again regard this arbitration as an appropriate forum for conducting any general inquiry into the quality, safety or consistency of the clomiphene tablets produced by Athlone and marketed in some considerable numbers now over a period of several years. I am therefore not disposed to allow this arbitration to be used as a vehicle for any general attack on those matters.

R.28 at PA 060. The arbitrator pointed out that Hynds was a witness, not a party, that he had appeared voluntarily, and that, if PBI's suggestions were carried out to their logical conclusion, they "might have very serious implications for Athlone as a company and for Mr. Hynds as an individual." *Id.* at PA 062. The arbitrator concluded:

> I am not willing to expose Mr. Hynds to any conceivable prejudice to his own position or to Athlone's position in circumstances where I do not believe this Tribunal is adequately provided with the evidence or the means to carry those things through to their proper and logical conclusion.

*Id.* Nevertheless, the arbitrator permitted PBI to raise the issue of the alleged inconsistencies in Athlone's product based on the Athlone batch records. Therefore, PBI introduced the testimony of several experts

who reviewed the records and based their expert opinions on the inconsistencies that they found therein.[4]

## C. *Decision of the District Court*

Generica asked the district court to confirm the foreign arbitral award; PBI asked the court to vacate it. The district court considered PBI's due process allegation: The arbitrator's refusal to permit cross-examination evidence from Hynds "that, in practice and despite his best efforts and good manufacturing practices, he had been unable to produce uniform tablets using Generica's formula and processes," denied PBI due process. R.47 at 9. The court noted first the arbitrator's decision that the Agreement contained no implied terms that the CC formula and manufacturing process would be capable of FDA approval. The court concluded that PBI's "central question" of whether the formula and process were amenable to FDA approval was immaterial to the breach of contract determination. *Id.* at 10. It also concluded that, although the product's potential for FDA approval was important in the damages determination, PBI was obliged under the Agreement to sort out what kind of development might be necessary and to work with Generica to move toward FDA approval. The district court acknowledged the arbitrator's findings that PBI failed to perform those obligations and that cross-examination of Hynds would not have resolved the real issue of the arbitration. The court found persuasive the arbitrator's conclusion that PBI's reliance on that evidence was misplaced; it quoted the arbitrator's comment in the interim award:

> It would have taken far more than anything that might have emerged in further cross-examination of Mr. Hynds to persuade me that Generica's formulation and manufacturing processes were inherently

---

4. For example, Dr. J. Schwartz was asked whether he agreed that the results from "the Athlone batches were within specification and show that the product can be manufactured in a reproducible and controlled manner." R.28 at PA 074. He responded: "No. I disagree with several of those points. One that they all meet

specifications. There are some points here that do not.... The variability in these data indicate to me that the process is not one that is in control and a process in control is what is required to be demonstrated to the FDA inspectors in order to obtain approval." *Id.*

incapable of being adopted ... by PBI so as to be amenable to FDA approval.... *Id.* at 12.

The district court refused to review the arbitrator's factfinding but then stated that, if it were appropriate to review that exclusion of evidence, the court would find that it did not deprive PBI of a fair hearing. It concluded that PBI had adequate opportunity to present its case because the arbitrator expressly disclaimed reliance on Hynds' direct testimony and thereby eliminated PBI's need to elicit further evidence from Hynds. The district court confirmed the arbitral award and entered judgment in favor of Generica and against PBI. Finding that there was no just reason for delay, it granted final judgment pursuant to Rule 54(b).

## II

## DISCUSSION

The statute that implements the New York Convention, 9 U.S.C. §§ 201 *et seq.*, authorizes a party awarded a foreign arbitral award to bring an action in federal court seeking confirmation of the award. *See* 9 U.S.C. § 207. Correspondingly, federal courts have jurisdiction under chapter 2 of Title 9 to enforce awards made under the New York Convention. *Id.* § 203; *see Lander Co. v. MMP Invs., Inc.,* 107 F.3d 476, 479 (7th Cir.), *pet'n for cert. filed,* 65 U.S.L.W. 3799 (May 19, 1997) (No. 96–1844). The court reviewing the award "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207. One ground for refusal is that "the party against whom the award is invoked" furnishes proof that it "was otherwise unable to present his case." *Id.* § 201, Article V(1)(b). In this case, therefore, the district court was required to enforce the award unless PBI demonstrated that it was unable to present its case before the arbitrator. PBI's submission is that it was prevented from presenting its case and was denied a fair hearing because the arbitrator refused to permit PBI to cross-examine the one witness critical to its case, Tony Hynds.

■ A court of appeals reviews a district court's decision confirming an arbitration award under ordinary standards: accepting findings of fact that are not clearly erroneous and deciding questions of law de novo. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 947–48, 115 S.Ct. 1920, 1925–26, 131 L.Ed.2d 985 (1995); *see Prudential–Bache Sec., Inc. v. Tanner,* 72 F.3d 234, 237 (1st Cir.1995).

As the Court noted in *First Options,* arbitration "is simply a matter of contract between the parties." 514 U.S. at 943, 115 S.Ct. at 1924. When the parties agree to have their disputes settled by an arbitrator, they also agree to accept the arbitrator's view of the facts and of the meaning of the contract. *See United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 37–38, 108 S.Ct. 364, 370–71, 98 L.Ed.2d 286 (1987) ("Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts."). In this case, the parties agreed, in the Terms of Reference, that the "Arbitrator, in his discretion, [shall] decide what evidence to admit and in what form evidence is to be tendered," and also that the "weight to be given any particular evidence shall be a matter for the judgment of the Arbitrator."

■ PBI contends that the arbitration procedure, by curtailing cross-examination of Tony Hynds, did not satisfy fundamental due process requirements. Under Article V(1)(b) of the New York Convention, proof that a party was "unable to present his case" constitutes a proper defense. As the Second Circuit has noted, that defense basically corresponds to the due process defense that a party was not given "the opportunity to be heard 'at a meaningful time and in a meaningful manner'" as defined in *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). *Iran Aircraft Indus. v. Avco Corp.,* 980 F.2d 141, 146 (2d Cir.1992) (also holding that enforcement of an arbitral award should be refused if a party was denied a due process hearing). Therefore, an arbitral award should be denied or vacated if the party challenging the award proves that

he was not given a meaningful opportunity to be heard as our due process jurisprudence defines it. *Id.* at 145; *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (Rakta)*, 508 F.2d 969, 975 (2d Cir.1974) (recognizing that an Article V(1)(b) defense "essentially sanctions the application of the forum state's standards of due process").

■ It is clear that an arbitrator must provide a fundamentally fair hearing. *See Iran Aircraft*, 980 F.2d at 146; *Hoteles Condado Beach v. Union De Tronquistas*, 763 F.2d 34, 40 (1st Cir.1985); *Hall v. Eastern Air Lines, Inc.*, 511 F.2d 663, 663–64 (5th Cir.1975). A fundamentally fair hearing is one that "meets 'the minimal requirements of fairness'—adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator." *Sunshine Mining Co. v. United Steelworkers*, 823 F.2d 1289, 1295 (9th Cir. 1987) (internal citation omitted). Nevertheless, parties that have chosen to remedy their disputes through arbitration rather than litigation should not expect the same procedures they would find in the judicial arena.[5] As the First Circuit has explained:

> An arbitrator enjoys wide latitude in conducting an arbitration hearing. Arbitration proceedings are not constrained by formal rules or procedure or evidence; the arbitrator's rule is to resolve disputes, based on his consideration of all relevant evidence, once the parties to the dispute have had a full opportunity to present their cases.

*Hoteles Condado Beach*, 763 F.2d at 38.

■ Concerning evidentiary matters, the Supreme Court has noted that "[a]rbitrators are not bound by the rules of evidence." *Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 203–04 n. 4, 76 S.Ct. 273, 276–77 n. 4, 100 L.Ed. 199 (1956). An "arbitrator is not bound to hear all of the evidence tendered by the parties.... [H]e must give each of the parties to the dispute an adequate opportunity to present its evidence and arguments." *Hoteles Condado Beach*, 763 F.2d at 39. When the exclusion of relevant evidence actually deprived a party of a fair hearing, therefore, it is appropriate to vacate an arbitral award.

■ Our review of this record makes clear that PBI has no due process claim. PBI asserts that its cross-examination of Hynds concerning Athlone's actual manufacturing practices was necessary because Hynds was the only source of evidence that Generica's formulation and processes were incapable, in practice, of producing uniform tablets and therefore could not be approved by the FDA. We cannot agree. First, it is important to keep in mind that the arbitrator took the view that, with respect to liability, the key question before him was not whether the Generica formula was susceptible to qualifying under FDA standards but whether the parties had committed their best efforts to developing a product that would qualify. He therefore did not regard Athlone's experience in working with the formula to be central to the liability issue before him. Nevertheless, because the susceptibility of the formula to FDA approval was germane to the issue of damages, he did allow development of the record on this point from other evidence—the Athlone batch results, the analysis of those results by expert witnesses and PBI's own production of a 6,000–tablet batch and then a full-scale FDA-approvable 100,000–tablet batch. PBI therefore was able to place before the arbitrator its theory of the case.[6] The arbitrator rejected PBI's alleged concern about the dough-like granulation in light of its successful 100,000–tablet batch. Moreover, re-

---

**5.** As Judge Cudahy recently wrote for our court,

> A party's choice to accept arbitration entails a trade-off. A party can gain a quicker, less structured way of resolving disputes; and it may also gain the benefit of submitting its quarrels to a specialized arbiter.... Parties lose something, too: the right to seek redress from the courts for all but the most exceptional errors at arbitration.

*Dean v. Sullivan*, 118 F.3d 1170, 1173 (7th Cir. 1997).

**6.** PBI had contended before the arbitrator that, because the product was not amenable to FDA approval, there could be no lost profit. The arbitrator specifically stated, however, that he had "no hesitation in rejecting PBI's contention that Generica's formulation and processes were not amenable to FDA approval." R.1, Ex.7 at 6; *see also* R.1, Ex.2 ¶¶ 112, 113.

alizing the restrictions that had been placed on the cross-examination of Mr. Hynds, the arbitrator expressly noted that he would place diminished reliance on his direct testimony,[7] thereby eliminating any possibility of prejudice to PBI. In the end, PBI was not prevented from presenting its case to the arbitrator.

Moreover, we believe the arbitrator's procedural handling of the Hynds cross-examination was quite fair. Tony Hynds was a witness asked to appear by Generica, not by PBI. Hynds presented both written and oral testimony voluntarily. Cross-examination was allowed in full until PBI raised allegations with serious implications for Hynds personally and for his company. *See* R.1, Ex.2 at 60. At that point, the arbitrator gave the parties a full explanation of his concerns and halted cross-examination on those topics to allow Hynds the opportunity to obtain legal advice. When Hynds was planning to leave the hearing in Paris, PBI expressly declined the opportunity to request that Hynds remain at the hearing. PBI could have sought an order compelling Hynds to attend further hearings. Indeed, PBI's counsel at oral argument explained that a party could ask an arbitrator for letters rogatory to have a witness appear in the arbitration. However, PBI made no formal request to the arbitrator for letters rogatory or took any steps to secure compulsory process.[8] No other suggestion of procedural unfairness is alleged, and our review of the record indicates that the arbitrator gave to the parties every courtesy and generous latitude that could be accorded.

We conclude that the arbitrator did not abuse his discretion in his handling of this evidentiary ruling. He had before him am-

ple evidence upon which to decide the dispute. He weighed the conflicting evidence (without considering Hynds' evidence) and decided that PBI had breached the Agreement. Although there have been cases in which an arbitrator denied a party the opportunity to a meaningful hearing, this cannot be considered one of them. *See Tempo Shain Corp. v. Bertek, Inc.,* 120 F.3d 16, 21 (2d Cir.1997) (holding that, under the FAA § 10(a), arbitration panel's refusal to continue hearings to allow witness to testify, the only witness with evidence of fraud not found from other sources, was fundamental unfairness and misconduct sufficient to vacate the award); *Iran Aircraft Indus. v. Avco Corp.,* 980 F.2d 141, 146 (2d Cir.1992) (vacating award because tribunal changed evidentiary rules during hearing and thus prevented party from presenting its documentary evidence); *Hoteles Condado Beach v. Union De Tronquistas,* 763 F.2d 34, 40 (1st Cir.1985) (vacating award when arbitrator excluded the only evidence available to refute the claims); *Hall v. Eastern Air Lines, Inc.,* 511 F.2d 663, 664 (5th Cir.1975) (refusing to enforce award because arbitration board refused to give weight to Hall's previously untendered alibi defense). The arbitrator's curtailment of cross-examination of Tony Hynds was not such a fundamental procedural defect that it violated our due process jurisprudence and therefore the New York Convention.

## Conclusion

For the reasons presented, the judgment of the district court is affirmed. Generica's request for attorneys' fees pursuant to Federal Rule of Appellate Procedure 38 is denied.

---

**7.** The arbitrator reconsidered the matter of Tony Hynds' testimony and issued a ruling on June 12, 1994, stating that he was "in no position to compel Mr. Hynds to tender himself for further cross-examination" and that he would receive submissions from the parties concerning what weight to give Hynds' evidence. R.9 at 183. In the Interim Award, the arbitrator explained:

[I]n assessing the weight to be given to [Hynds'] own evidence and to certain aspects of Generica's case, I have to take full account, as I do, of the fact that PBI did not have the opportunity to cross-examine Mr. Hynds in certain areas that they would otherwise have

done.... [T]he fact that Athlone has, evidently, manufactured substantial numbers of tablets over a period of several years now is, of itself, something to which I cannot—and do not—in the circumstances attach the weight that it would otherwise deserve.

R.1, Ex.2 at 61.

**8.** For this reason, PBI cannot now assert that the arbitrator should have initiated the process for compelling Hynds' testimony. PBI's inaction waives its claim that the arbitrator did not act on its own power to compel the witness' testimony.

Affirmed.

Motion for Fees Denied.