**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**March 23, 2004**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

Nos. 02-20042 & 03-20602
_____

Karaha Bodas Co., L.L.C.,

Plaintiff-Appellee,

V.

Perusahaan Pertambangan Minyak Dan Gas Bumi Negara; Et Al,

Defendants,

Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas, Houston Division

_____

Before KING, Chief Circuit Judge, DAVIS, Circuit Judge, and ROSENTHAL,[*] District Judge.

ROSENTHAL, District Judge:

Thirty years ago, the United States Supreme Court recognized that "[a] contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is . . . an almost indispensable precondition to achievement of the orderliness and predictability essential to any international

---

[*] District Judge of the Southern District of Texas, sitting by designation.

business transaction. . . . Such a provision obviates the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties or unfamiliar with the problem area involved."[1] When, as here, parties to international commercial contracts agree to arbitrate future disputes in a neutral forum, orderliness and predictability also depend on the procedures for reviewing and enforcing arbitral awards that may result. This appeal arises from an arbitral award (the "Award") made in Geneva, Switzerland, involving contracts negotiated and allegedly breached in Indonesia. The Award imposed liability and damages against Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina"), which is owned by the government of Indonesia, in favor of Karaha Bodas Company, L.L.C. ("KBC"), a Cayman Islands company. KBC filed this suit in the federal district court in Texas to enforce the Award under the United National Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), and filed enforcement actions in Hong Kong and Canada as well.[2] While those enforcement proceedings were pending, Pertamina appealed the Award in the Swiss courts, seeking annulment. When that effort failed, and after the Texas district court granted summary judgment enforcing the Award,

---

[1]  Scherk v. Alberto-Culver Co., 417 U.S. 506, 516 (1974).

[2]  United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (entered into force with respect to the United States, Dec. 29, 1970), codified at 9 U.S.C. § 201 et seq.

Pertamina obtained an order from an Indonesian court annulling the Award.[3]

Pertamina appealed to this court. During the appeal, Pertamina filed in the district court a motion to set aside the judgment under Federal Rule of Civil Procedure 60(b)(2), based on newly-discovered evidence Pertamina contended should have been disclosed during the arbitration, and under Rule 60(b)(5), based on the Indonesian court's decision annulling the arbitration Award. This court remanded to the district court for consideration of Pertamina's Rule 60(b) motion.[4] On remand, the district court denied Pertamina's Rule 60(b) motion. This appeal consolidates Pertamina's challenges to the grant of summary judgment and to the denial of the Rule 60(b) motion.

Pertamina urges this court to reverse the district court's decision enforcing the Award on several grounds under the New York Convention. We conclude that the record forecloses Pertamina's arguments that procedural violations and other errors during the arbitration preclude enforcement. We reject Pertamina's argument

---

[3] A different panel of this court heard a separate appeal from the district court's injunction against Pertamina's prosecution of the action in Indonesia, but did not decide the effect of the Indonesian court's annulment order on the enforcement proceeding. Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 335 F.3d 357, 373-74 (5th Cir. 2003). One of the issues before this panel is whether the Indonesian court's order is a defense to the enforcement of the Award.

[4] Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 2003 WL 21027134, at *4-6 (5th Cir. March 5, 2003).

3

that the Indonesian court's order annulling the Award bars its enforcement under the New York Convention; this argument is inconsistent with the arbitration agreements Pertamina signed and with its earlier position that Switzerland, the neutral forum the parties selected, had exclusive jurisdiction over an annulment proceeding. We reject Pertamina's efforts to delay or avoid enforcement of the Award as evidencing a disregard for the international commercial arbitration procedures it agreed to follow.[5] In short, we affirm the district court's judgment enforcing the Award, for the reasons set out in detail below.

## I. Background

### A. Procedural and Factual History

KBC explores and develops geothermal energy sources and builds electric generating stations using geothermal sources. Pertamina is an oil, gas, and geothermal energy company owned by the Republic of Indonesia.[6] In November 1994, KBC signed two contracts to produce electricity from geothermal sources in Indonesia. Under the Joint Operation Contract ("JOC"), KBC had the right to develop geothermal energy sources in the Karaha area of Indonesia; Pertamina was to manage the project and receive the electricity

---

[5] We note that the length of this opinion reflects the number of arguments Pertamina raises to evade its obligations under the Award more than the strength of those arguments.

[6] PLN, an electric utility owned by the government of Indonesia, was a party to the arbitration but was dismissed from the district court action.

4

generated. Under the Energy Sales Contract ("ESC"), PLN agreed to purchase from Pertamina the energy generated by KBC's facilities. Both contracts contained almost identical broad arbitration clauses, requiring the parties to arbitrate any disputes in Geneva, Switzerland under the Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL").[7]

---

[7] Article 13.2(a) of the arbitration provision of the JOC provided:

> If the Dispute cannot be settled within thirty (30) working days by mutual discussions as contemplated by Article 13.1 hereof, the Dispute shall finally be settled by an arbitral tribunal (the "Tribunal") under the UNCITRAL arbitration rules . . . . Each Party will appoint an arbitrator within thirty (30) days after the date of a request to initiate arbitration, who will then jointly appoint a third arbitrator within thirty (30) days of the date of the appointment of the second arbitrator, to act as Chairman of the Tribunal. Arbitrators not appointed within the time limits set forth in the preceding sentence shall be appointed by the Secretary General of the International Center for Settlement of Investment Disputes. Both Parties undertake to implement the arbitration award. The site of the arbitration shall be Geneva, Switzerland. The language of the arbitration shall be English. The Parties expressly agree to waive [certain Indonesian procedural laws]. . . .

JOC, Art. 13.2(a),(d). Section 8.2(a) of the ESC's arbitration provision similarly read:

> If the Dispute cannot be settled within forty-five calendar (45) days by mutual discussions as contemplated by Section 8.1 hereof, the Dispute shall finally be settled by an arbitral tribunal (the "Tribunal") under the UNCITRAL arbitration rules . . . . PLN on one hand, and [KBC] and PERTAMINA on the other hand, will each appoint one arbitrator, in each case within thirty (30) days after the date of a request to initiate arbitration, who will then jointly appoint a third arbitrator within thirty (30) days of the date of

5

On September 20, 1997, the government of Indonesia temporarily suspended the project because of the country's financial crisis. The government of Indonesia indefinitely suspended the project on January 10, 1998. On February 10, 1998, KBC notified Pertamina and PLN that the government's indefinite suspension constituted an event of "force majeure" under the

> the appointment of the second arbitrator, to act as Chairman of the Tribunal. Arbitrators not appointed within the time limits set forth in the preceding sentence shall be appointed by the Secretary General of the International Center for Settlement of Investment Disputes, upon the request of any Party. All Parties undertake to implement the arbitration award. The site of the arbitration shall be Geneva, Switzerland. The language of the arbitration shall be English. The Parties expressly agree to waive the applicability of [certain Indonesian procedural laws]. . . .

Both contracts contained the following additional arbitration language:

> The award rendered in any arbitration commenced hereunder shall be final and binding upon the Parties and judgment thereon may be entered in any court having jurisdiction for its enforcement. The Parties hereby renounce their right to appeal from the decision of the arbitral panel and agree that in accordance with Section 641 of the Indonesian Code of Civil Procedure [neither] Party shall appeal to any court from the decision of the arbitral panel and accordingly the Parties hereby waive the applicability of [certain Indonesian laws]. In addition, the Parties agree that [neither] Party shall have any right to commence or maintain any suit or legal proceeding concerning a [dispute hereunder until the] dispute has been determined in accordance with the arbitration procedure provided for herein and then only to enforce or facilitate the execution of the award rendered in such arbitration.

JOC, Art. 13.2(d); ESC, § 8.2(d).

6

contracts. KBC initiated arbitration proceedings on April 30, 1998. In its notice of arbitration, KBC appointed Professor Piero Bernardini, vice-chair of the International Chamber of Commerce's ("ICC") International Court of Arbitration and member of the London Court of International Arbitration, to serve as an arbitrator. Pertamina, however, did not designate an arbitrator in the contractually allotted thirty days. The JOC and ESC both provided that if a party failed to appoint an arbitrator within thirty days, the Secretary-General of the International Center for Settlement of Investment Disputes ("ICSID") was to make the appointment. After notifying Pertamina, PLN, and the government of Indonesia, the ICSID appointed Dr. Ahmed El-Kosheri, another vice-chair of the ICC, as the second arbitrator. As specified in the JOC and ESC, the two appointed arbitrators then selected the chairman of the arbitration panel, Yves Derains, the former Secretary-General of the ICC.

Pertamina raised threshold challenges to the Tribunal's consolidation of the claims KBC raised under the JOC and the ESC into one arbitration proceeding and to the selection of the panel. In October 1999, the Tribunal issued a Preliminary Award, rejecting Pertamina's threshold challenges and ruling that the government of Indonesia was not a party to the contracts or to the arbitration proceeding.

KBC filed its Revised Statement of Claim in November 1999. Pertamina received a number of extensions before it filed its reply

to the Revised Statement of Claim in April 2000. KBC filed a rebuttal to that reply in May 2000. In response to KBC's rebuttal, Pertamina sought additional discovery and a continuance of the proceedings, claiming that KBC had raised assertions and added elements to its case-in-chief not contained in the Revised Statement of Claim.

From the outset, the parties vigorously disputed whether KBC could have obtained financing to build the project if the government of Indonesia had not issued the suspension decree. Pertamina contended that KBC could not have built the project – and therefore suffered no damages from the government decree suspending the work – because the precarious situation in Indonesia effectively made the necessary financing unavailable. Pertamina asserted that KBC's rebuttal introduced a new theory as to how project financing could have been obtained. KBC changed from focusing on the availability of third-party financing and argued in the rebuttal that one of its direct investors, FPL Energy ("FPL"), would have provided project financing if no other source was available. Shortly before the scheduled hearing, Pertamina sought discovery of documents relating to FPL's asserted willingness to finance the project. In May 2000, the Tribunal denied Pertamina's request to obtain this discovery before the hearing and denied the request for a continuance. The Tribunal stated that it would decide at the conclusion of the hearing "whether any adjustment to the proceeding" would be required because of the discovery

8

requested.  The hearing on the merits proceeded as scheduled in June 2000.

The Tribunal received a large record.  Both sides submitted extensive witness statements, expert reports, exhibits, and briefs. During the hearing, Pertamina and PLN cross-examined KBC's witnesses, including two witnesses who testified about KBC's ability to finance the project, Robert McGrath, Treasurer of FPL Group, Inc., and Leslie Gelber, former Vice-President of Development at FPL Energy.  Both witnesses submitted declarations stating that "FPL Energy was prepared in 1998 to provide bridge financing or direct capital to continue the Project through the phases of the Project that were scheduled to be completed during Indonesia's period of instability."  At the hearing, counsel for Pertamina specifically questioned McGrath about the availability of project financing from FPL.  During that questioning, a Tribunal member asked McGrath whether the investment in the project was protected by a form of political risk insurance.  McGrath responded, "I am not sure of that.  I know there were some discussions at the time, but I don't recollect as to whether it was or wasn't."  Counsel for Pertamina asked no follow-up questions. At the end of the hearing, counsel for Pertamina declined to pursue the previously requested discovery and stated that the record had been "fully" made.

In the Final Award, the Tribunal found that under the JOC and the ESC, Pertamina and PLN had accepted the risk of loss arising

from a "Government Related Event." The Tribunal interpreted the contracts as "putting the consequences of a Governmental decision which prevents the performance of the contract at Pertamina's . . . sole risk." The Tribunal awarded KBC $111.1 million, the amount KBC had expended on the project, and $150 million in lost profits. The Tribunal explained in detail why it rejected the lost profits amount KBC sought – $512.5 million – and how it arrived at the amount awarded.

In February 2001, Pertamina appealed the Award to the Supreme Court of Switzerland. While that appeal was pending, KBC initiated this suit in the federal district court to enforce the Award.

B.    The District Court Decisions

Pertamina challenged enforcement of the Award in the federal district court on four grounds under Article V of the New York Convention: (1) the procedure for selecting the arbitrators was not in accordance with the agreement of the parties; (2) the Tribunal improperly consolidated the claims into one arbitration; (3) Pertamina was "unable to present its case" to the Tribunal; and (4) enforcement of the damages Award would violate the public policy of the United States. As to the first two grounds, Pertamina contended that the decision to consolidate the claims under the two contracts was procedurally improper and that KBC's unilateral appointment of an arbitrator violated the ESC arbitration provision. As to the third ground, Pertamina argued

10

that the Tribunal improperly reversed its finding in the Preliminary Award that Pertamina did not breach the contracts by holding Pertamina liable for nonperformance in the Final Award; that the Tribunal's denial of Pertamina's request for discovery of FPL's records prevented Pertamina from fully presenting its case; and that the Tribunal's denial of a continuance after KBC filed its rebuttal to the reply to the Revised Statement of Claim prevented Pertamina from fully preparing to meet KBC's contentions. As to the fourth ground, Pertamina argued that the Award violated the international abuse of rights doctrine and punished Pertamina for obeying the Indonesian government's decree. Under Federal Rule of Civil Procedure 56(f), Pertamina requested a delay in the district court in responding to KBC's summary judgment motion to seek discovery of the same FPL records it had unsuccessfully sought in the arbitration.

Pertamina continued its appeal seeking annulment of the Award to the Supreme Court of Switzerland while the enforcement action was pending in the district court in Texas. The Texas district court slowed the proceedings in deference to Pertamina's request that the Swiss court first be allowed to decide whether to annul the Award. In April 2001, the Swiss Supreme Court dismissed Pertamina's claim because of untimely payment of costs. Pertamina moved for reconsideration; the Swiss court denied that motion in August 2001.

In December 2001, the district court enforced the Award, rejecting each of Pertamina's grounds for refusal. The district court carefully reviewed the record in examining Pertamina's claimed inability to challenge in the arbitration proceeding KBC's argument that it could have obtained project financing from its investor, FPL. The district court denied Pertamina's Rule 56(f) request for additional discovery on this issue. Pertamina filed its notice of appeal from the district court's summary judgment enforcing the Award in January 2002.

Having failed in its effort to annul the Award in the Swiss courts, Pertamina filed suit in Indonesia seeking annulment. In August 2002, an Indonesian court annulled the Award. KBC continued with enforcement suits in Hong Kong and Canada. In October 2002, while this appeal was pending, Pertamina discovered in the Canadian proceeding that FPL and one other KBC investor, Caithness, had held a political risk insurance policy covering the KBC project through Lloyd's of London. Pertamina also learned that Lloyd's had paid $75 million under that insurance policy to FPL and Caithness for the losses resulting from the Indonesian government's suspension of the project.

In December 2002, Pertamina filed a motion in the district court to vacate the judgment on three grounds: (1) newly-discovered evidence of the political risk insurance policy, under Rule 60(b)(2); (2) the Indonesian court's annulment of the underlying arbitral Award, under Rule 60(b)(5); and (3) satisfaction of

12

judgment to the extent of the $75 million insurance payment. Pertamina also filed a motion in this court to supplement the record and briefing. In both motions, Pertamina argued that the existence of political risk insurance coverage in favor of FPL undermined KBC's claims that the contracts allocated political risks to Pertamina and that FPL would have financed the project in order to avoid losing its earlier investment. Additionally, Pertamina argued that the payment of the insurance proceeds undermined the Tribunal's determination of damages. Pertamina urged that KBC's failure to disclose the insurance during the arbitration provided a basis for refusing to enforce the Award and made the district court's summary judgment improper.

This court denied Pertamina's motion to supplement the appellate record under Federal Rule of Appellate Procedure 10(e) and remanded to the district court for consideration of Pertamina's Rule 60(b) motion. On remand, the district court denied the motion, finding that Pertamina failed to show that KBC had misled the tribunal or that KBC's failure to produce the political risk insurance policy violated the rules governing the arbitration.

The district court also rejected Pertamina's claim that Indonesia had primary jurisdiction to decide to annul the Award and declined to give effect to the Indonesian court's annulment order as a defense to enforcement. The district court imposed judicial estoppel to preclude Pertamina from asserting that Indonesian procedural law had governed the arbitration and that Indonesian

13

courts had primary jurisdiction to review the Award. Finally, the district court rejected Pertamina's argument that the amount of the Award should be offset by the $75 million insurance payment.[8]

This appeal followed. Pertamina argues that the Tribunal improperly consolidated the claims into one arbitration proceeding; the selection of the arbitrators violated the JOC and ESC; the Tribunal denied Pertamina a fair opportunity to present its case because the Tribunal reversed part of its Preliminary Award without notice, denied Pertamina's request to postpone the arbitration, and denied Pertamina's discovery requests; the Award is contrary to public policy because it violated the international law abuse of rights doctrine and because the district court's decision holds Pertamina liable for complying with Indonesian law; and the

---

[8] The day after the district court issued its final order denying Pertamina's Rule 60(b) motion, KBC submitted a letter to the court "clarifying" that while FPL was not the insured under the political risk insurance policy, FPL owned one of the named insureds that benefitted under the policy. The district court issued a supplemental order acknowledging KBC's letter and noting that the fact that FPL was not a named insured under the insurance policy "was only one of many factors that the Court considered in denying Pertamina's Rule 60(b) Motion. Thus, the fact that an entity owned by FPL, but not FPL itself, benefit[t]ed under the policy does not change any legal conclusion" in the court's decision. On the same day that the district court issued its supplemental order, and ten days after the court's denial of Pertamina's Rule 60(b) motion, KBC filed a Motion to Amend Findings of Fact under Federal Rule of Civil Procedure 52(b). In a second supplemental order, the district court recognized KBC's motion as a Motion to Amend or Alter Judgment under Federal Rule of Civil Procedure 59(e) and granted the motion. The court assumed, without deciding, that FPL benefitted from the risk insurance policy, but held that it did not affect the basis of the court's decision. Pertamina argues that the district court did not have jurisdiction to issue either of these two supplemental orders. This court agrees that the issue addressed in the supplemental orders does not affect the outcome of this case.

14

Indonesian court's annulment of the arbitral Award is a defense to enforcement under the New York Convention. Each ground is addressed below.

## II. Analysis

A district court's decision confirming an arbitration award is reviewed under the same standard as any other district court decision.[9] This court reviews a district court's grant of summary judgment <u>de novo</u>.[10]

**A.  The New York Convention**

The New York Convention provides a carefully structured framework for the review and enforcement of international arbitral awards. Only a court in a country with primary jurisdiction over an arbitral award may annul that award.[11] Courts in other countries have secondary jurisdiction; a court in a country with secondary jurisdiction is limited to deciding whether the award may be enforced in that country.[12] The Convention "mandates very different regimes for the review of arbitral awards (1) in the [countries] in which, or under the law of which, the award was made, and (2) in

---

[9]  <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 947-948 (1999); <u>Hughes Training, Inc. v. Cook</u>, 254 F.3d 588, 592 (5th Cir. 2001).

[10]  <u>Eason v. Thaler</u>, 73 F.3d 1322, 1324 (5th Cir. 1996).

[11]  <u>Karaha Bodas Co.</u>, 335 F.3d at 364; <u>see</u> <u>Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.</u>, 126 F.3d 15, 23 (2d Cir. 1997).

[12]  <u>Karaha Bodas Co.</u>, 335 F.3d at 364.

15

other [countries] where recognition and enforcement are sought."[13] Under the Convention, "the country in which, or under the [arbitration] law of which, [an] award was made" is said to have primary jurisdiction over the arbitration award.[14] All other signatory states are secondary jurisdictions, in which parties can only contest whether that state should enforce the arbitral award.[15] It is clear that the district court had secondary jurisdiction and considered only whether to enforce the Award in the United States.

Article V enumerates specific grounds on which a court with secondary jurisdiction may refuse enforcement.[16] In contrast to the

_____

[13] Alghanim, 126 F.3d at 23 (quoted in Karaha Bodas Co., 335 F.3d at 364).

[14] Karaha Bodas Co., 335 F.3d at 364.

[15] Id.

[16] Article V, Section 201 of the New York Convention provides:

> **1.** Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:
>
> **(a)** The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or
>
> **(b)** The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or
>
> **(c)** The award deals with a difference not contemplated by or not falling within the terms of

16

limited authority of secondary-jurisdiction courts to review an arbitral award, courts of primary jurisdiction, usually the courts of the country of the arbitral situs, have much broader discretion to set aside an award. While courts of a primary jurisdiction country may apply their own domestic law in evaluating a request to annul or set aside an arbitral award, courts in countries of

---

the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

**(d)** The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

**(e)** The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

**2.** Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

**(a)** The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

**(b)** The recognition or enforcement of the award would be contrary to the public policy of that country.

9 U.S.C. § 201, Art. V(1)-(2). See generally Alghanim, 126 F.3d at 23; Susan Choi, Judicial Enforcement of Arbitration Awards Under the ICSID and New York Conventions, 28 N.Y.U. J. Int'l L. & Pol. 175 (1996).

secondary jurisdiction may refuse enforcement only on the grounds specified in Article V.[17]

The New York Convention and the implementing legislation, Chapter 2 of the Federal Arbitration Act ("FAA"), provide that a secondary jurisdiction court must enforce an arbitration award unless it finds one of the grounds for refusal or deferral of recognition or enforcement specified in the Convention.[18] The court may not refuse to enforce an arbitral award solely on the ground that the arbitrator may have made a mistake of law or fact.[19] "Absent extraordinary circumstances, a confirming court is not to reconsider an arbitrator's findings."[20] The party defending against enforcement of the arbitral award bears the burden of proof.[21] Defenses to enforcement under the New York Convention are construed narrowly, "to encourage the recognition and enforcement of

---

[17]  Alghanim, 126 F.3d at 23 (cited in Karaha Bodas Co., 335 F.3d at 368).

[18]  9 U.S.C. § 207.

[19]  Europcar Italia, S.p.A. v. Maiellano Tours, Inc., 156 F.3d 310, 315 (2d Cir. 1998); Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, 990 F.2d 957, 960 (7th Cir. 1993).

[20]  Europcar Italia, 156 F.3d at 315.

[21]  Imperial Ethiopian Gov't v. Baruch-Foster Corp., 535 F.2d 334, 336 (5th Cir. 1976); see Czarina, L.L.C. v. W.F. Poe Syndicate, 2004 WL 205611, at *6 n.3 (11th Cir. Feb. 4, 2004).

commercial    arbitration    agreements    in    international

contracts . . . ."[22]

## B.    The Choice-of-Law Issues

In the JOC and ESC, the parties stipulated that "the site of

the arbitration shall be Geneva."   The Tribunal concluded that

under the arbitration agreements, Swiss procedural law applied as

the law of the arbitral forum.[23]  From 1998 to April 2002, Pertamina

consistently and repeatedly took the position before the Tribunal,

the Swiss courts, and the United States district court, that Swiss

procedural law applied to the arbitration.[24]   In April 2002, after

_____

[22]    Imperial Ethiopian Gov't, 535 F.2d at 335; Parsons & Whittemore
Overseas Co., Inc. v. Societe Generale de L'Industrie du Papier, 508
F.2d 969, 974, 976 (2d Cir. 1974).

[23]    The Tribunal specifically cited Swiss procedural law in its
Preliminary Award.  The Tribunal first cited Swiss law regarding the
intentions of parties to a contract to help guide its determination
whether the government of Indonesia was a party to the JOC and ESC.  The
Tribunal cited the Swiss concept of "connexity" in concluding that KBC
could consolidate its claims under the contracts into a single
arbitration proceeding.  Finally, the Tribunal referred to Swiss common
law suggesting that arbitrators are not agents in determining that the
selection of Tribunal arbitrators was appropriate under the agreements.
The Final Award stated that it was "[m]ade in Geneva."

[24]    See, e.g., Prelim. Award, § B(1) ("The Respondents support this
conclusion by making reference to Swiss law as the JOC and the ESC
provide for UNCITRAL Arbitration in Geneva between the parties which are
neither Swiss nor Swiss resident.  As a result, and under both
contracts, the arbitration proceedings are governed by Chapter 12 of the
Swiss Private International Law Statutes.  Under Swiss law, [Respondent
contends] the Arbitral Tribunal is lacking jurisdiction because KBC
failed to comply with the contractual prerequisites to arbitration.");
id. at § C(1) ("The Respondents also state that, under the arbitration
agreements and Swiss law, the arbitrators have no power to consolidate
. . . ."); id. at § C(3) (citing a Swiss federal tribunal case in
support of its decision that a consolidated arbitration was
appropriate); id. at § D(1) (Respondents contend that "[s]uch solution
is not acceptable under the applicable Swiss law").
The district court found that Pertamina "specifically, repeatedly

the Swiss court had rejected Pertamina's annulment proceeding and the district court had held the Award enforceable in the United States, Pertamina moved in the district court for a stay of the Award pending the outcome of the annulment proceeding Pertamina had filed in Indonesia.  For the first time, Pertamina raised in the district court the argument that Indonesian, not Swiss, procedural law had applied to the arbitration.  Pertamina took this position in the district court as part of its argument that Indonesia had primary jurisdiction over the Award and therefore had the authority to set it aside rather than merely decline to enforce it.

Article V(1)(e) of the Convention provides that a court of secondary jurisdiction may refuse to enforce an arbitral award if it "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made."[25] Courts have held that the language, "'the competent authority of the country . . . under the law of which, that award was made' refers exclusively to procedural and not substantive law, and more

---

and unequivocally" argued that Swiss arbitration law applied in the arbitration.  Pertamina opened its motion to stay the district court proceedings pending appeal to the Swiss judiciary by stating:  "The arbitration award . . . was conducted subject to the arbitration laws of Switzerland, and the Swiss court is empowered to vacate an award rendered in Switzerland. . . . KBC is asking this Court to act prematurely to confirm an award that might be overturned in the country whose law governed the arbitration."  Pertamina added that "it is fundamental that the courts of the originating nation are in the best position to pass on issues under their own law. . . . Here, Pertamina's appeal encompasses questions of Swiss law."  Pertamina made similar arguments under Swiss procedural law in its responses to KBC's motion for summary judgment.

[25]  9 U.S.C. § 201, Art. V(1)(e).

precisely, to the regimen or scheme of arbitral procedural law under which the arbitration was conducted, and not the substantive law . . . applied in the case."[26]  In this appeal, Pertamina and the Republic of Indonesia (the "Republic"), as amicus, argue that the Tribunal and the district court erred in finding that Swiss procedural law, rather than Indonesian procedural law, applied. Pertamina and the Republic argue that in the arbitration agreements, the parties chose Indonesian procedural, as well as substantive, law to govern the arbitration.  Pertamina and the Republic assert that, as a result:  (1) the arbitration must be examined for compliance with Indonesian procedural law; and (2) the Indonesian court had primary jurisdiction to annul the Award, providing a defense to enforcement in the United States.  KBC responds that the Tribunal properly interpreted the parties' contracts in deciding that Swiss procedural law applied and the district court properly applied the New York Convention in affirming that decision.  This court agrees with KBC.

Under the New York Convention, the rulings of the Tribunal interpreting the parties' contract are entitled to deference.[27]

---

[26]  Int'l Standard Elec. Corp. v. Bridas Sociedad Anonima Petrolera, Indus. y Comercial, 745 F. Supp. 172, 178 (S.D.N.Y. 1990); see Alghanim, 126 F.3d at 21; M & C Corp. v. Erwin Behr GmbH & Co., KG, 87 F.3d 844, 848 (6th Cir. 1996).

[27]  Europcar Italia, 156 F.3d at 315; Nat'l Wrecking Co., 990 F.2d at 960; see James Ford Inc. v. Ford Dealer Computer Serv. Inc., 56 Fed. Appx. 324, 325 (9th Cir. 2003) (giving broad deference to an arbitrator's choice-of-law decision).

21

Unless the Tribunal manifestly disregarded the parties' agreement or the law, there is no basis to set aside the determination that Swiss procedural law applied.[28] The parties' arbitration agreements specified that the site of the arbitration was Geneva, Switzerland and that the arbitration would proceed under the UNCITRAL rules. Those rules specify that the "arbitral tribunal shall apply the law designated by the parties as applicable to the substance of the dispute."[29] It is undisputed that the parties specified that Indonesian substantive law would apply.[30] It is also undisputed that the contracts specified the site of the arbitration as Switzerland. The contracts did not otherwise expressly identify the procedural law that would apply to the arbitration. The parties did refer to certain Indonesian Civil Procedure Rules in the contracts.[31] Pertamina and the Republic argue that these

---

[28] Europcar Italia, 156 F.3d at 315; Nat'l Wrecking Co., 990 F.2d at 960.

[29] UNCITRAL Arbitration Rules, G.A. Res. 31/98, U.N. GAOR Comm'n Int'l Trade L., at Art. 33(1) (1976), http://www.uncitral.org/english/texts/arbitration/arb-rules.htm.

[30] Article 20 of the JOC and Section 12.1 of the ESC each provided: "This Contract shall be governed by the laws and regulations of [the] Republic of Indonesia."

[31] Pertamina and the Republic rely on the following contractual provisions for their position:

> The parties expressly agree to waive the applicability of (a) Article 650.2 of the Indonesian Code of Civil Procedure so that the appointment of the arbitrators shall not terminate as of the sixth (6th) Month after the date(s) of their appointments and (b) the second sentence of Article 620.1 of the Indonesian Code of Civil

22

references evidence an intent that while Switzerland would be the place of the arbitration, Indonesian procedural law would apply as the lex arbitri.

Under the New York Convention, an agreement specifying the place of the arbitration creates a presumption that the procedural law of that place applies to the arbitration.[32]  Authorities on

---

> Procedure so that the arbitration need not be completed within the specific time.

JOC at Art. 13.2(a); ESC at § 8.2(a).

> In accordance with Section 631 of the Indonesian Code of Civil Procedure, the Parties agree that the Tribunal need not be bound by strict rules of law where they consider the application thereof to particular matters to be inconsistent with the spirit of this Contract and the underlying intent of the Parties, and as to such matters their conclusion shall reflect their judgment of the correct interpretation of all relevant terms hereof and the correct and just enforcement of this Contract in accordance with such terms.

JOC at Art. 13.2(b); ESC at § 8.2(b).

> The parties hereby renounce their right to appeal from the decision of the arbitral panel and agree that in accordance with Section 641 of the Indonesian Code of Civil Procedure neither Party shall appeal to any court . . . and accordingly the Parties hereby waive the applicability of Articles 15 and 108 of the Law No. 1 of 1950 and any other provision of Indonesian law and regulations that would otherwise give the right to appeal the decisions of the arbitral panel.

JOC at Art. 13.2(d); ESC at § 8.2(d).

[32]  Albert Jan van den Berg, "The Application of the New York Convention by the Courts," ICCA Congress Series No. 9 25, 26 (Kluwer 1999); Sir Michael J. Mustill & Stewart C. Boyd, The Law and Practice of Commercial Arbitration in England 64 (Butterworths 2d ed. 1989); Alain Hirsch, The Place of the Arbitration and the Lex Arbitri, 34 Arb. J. 43, 46 (1979); Alan Scott Rau, The New York Convention in American Courts, 7 Am. Rev. Int'l Arb. 213, 224 (1996).  In their reports filed

23

international arbitration describe an agreement providing that one country will be the site of the arbitration but the proceedings will be held under the arbitration law of another country by terms such as "exceptional"; "almost unknown";[33] a "purely academic invention";[34] "almost never used in practice";[35] a possibility "more theoretical than real"; and a "once-in-a-blue-moon set of circumstances."[36] Commentators note that such an agreement would be complex, inconvenient, and inconsistent with the selection of a neutral forum as the arbitral forum.[37]

---

in the district court, recognized authorities on international arbitration retained by both Pertamina and KBC, including Albert Jan van den Berg, Sudargo Guatama, Alan Scott Rau, and Eric A. Schwartz, agreed that under the Convention, arbitration clauses designating the site of the arbitration presumptively designate that site as the source of the applicable procedural law.

[33] Mustill and Boyd, Commercial Arbitration at 64.

[34] Van den Berg, The Application of the New York Convention at 26.

[35] Id.

[36] Martin Hunter, Case and Comment: International Arbitration, [1988] Lloyd's Mar. & Comm. L. Q. 23, 26.

[37] See, e.g., Gary B. Born, International Commercial Arbitration: Commentary and Materials 761 (2d ed. 2001). Few reported cases involve arbitration clauses that separate the law of the forum state and the lex arbitri. In two such English cases, Naviera Amazonica Peruana S.A. v. Compania Internacional de Seguros del Peru, [1988] 1 Lloyd's L. Rep. 116 (C.A. 1987), and Union of India v. McDonnell Douglas Corp., [1993] 2 Lloyd's Rep. 48 (Q.B. 1992), the courts applied the presumption that the procedural law of the place specified as the forum for the arbitration would govern. Naviera Amazonica Peruana, [1988] 1 Lloyd's L. Rep. at 119; Union of India, [1993] 2 Lloyd's Rep. at 50. The Hong Kong court also relied upon this presumption in determining that Swiss procedural law governed the arbitration proceeding at issue in this case. Hong Kong decision at 7-8.

In the JOC and ESC, the parties expressly agreed that Switzerland would be the site for the arbitration. This agreement presumptively selected Swiss procedural law to apply to the arbitration. There is no express agreement in the JOC or ESC that Indonesia would be the country "under the law of which" the arbitration was to be conducted and the Award was to be made.[38] The Tribunal recognized the parties' selection of Switzerland by issuing the Award as "[m]ade in Geneva." In selecting Switzerland as the site of the arbitration, the parties were not choosing a physical place for the arbitration to occur, but rather the place where the award would be "made." Under Article 16(1) of the UNCITRAL rules, the "place" designated for an arbitration is the legal rather than physical location of the forum.[39] The arbitration proceeding in this case physically occurred in Paris, but the Award was "made in" Geneva, the place of the arbitration in the legal sense and the presumptive source of the applicable procedural law.[40]

The references in the contracts to certain Indonesian civil procedure rules do not rebut the strong presumption that Swiss

---

[38]  9 U.S.C. § 201, Art. V(1)(e).

[39]  See Jacomijn J. van Hof, Commentary on the UNCITRAL Arbitral Rules: The Application by the Iran-U.S. Claims Tribunal 109-10 (Kluwer 1991); see also UNCITRAL Arbitration Rules at Art. 16(1). Rules 16(2) and (3) expressly permit proceedings to be conducted at a location different from the designated "place" of the arbitration. UNCITRAL Arbitration Rules at Art. 16 (2)-(3). Rule 16(4) provides that "[t]he award shall be made at the place of arbitration." Id. at Art. 16(4).

[40]  Van Hof, Commentary on the UNCITRAL Arbitral Rules at 109-110.

procedural law applied to the arbitration.[41]  These references fall far short of an express designation of Indonesian procedural law necessary to rebut the strong presumption that designating the place of the arbitration also designates the law under which the award is made.

Pertamina and the Republic have belatedly asserted that the district court should have conducted a choice-of-law analysis to determine the law that would apply to the interpretation of the parties' contracts, rather than analyze the contracts under the New York Convention.  Pertamina and the Republic assert that the result of such an analysis would have been to identify Indonesian law as the decisional law under which to interpret the contracts.  This argument is inconsistent with the position Pertamina – and its experts on interpreting international commercial arbitration agreements – took earlier in this case, that the district court should review the Tribunal's interpretation of the contracts under the New York Convention.  A court conducts the multifactor choice-of-law analysis Pertamina now advocates in the absence of an

---

[41]  Robert N. Hornick, one of the authorities on international arbitration and Indonesian law who submitted an affidavit and report in the district court, provided an explanation for the references to the Indonesian laws in the arbitration clauses unrelated to any intent to designate Indonesia as the country under the law of which the Award would be made.  Hornick explained that each article of Indonesian law cited in the contracts imposes a requirement inconsistent with the contemplated arbitration.  (Hornick Decl. ¶¶ 28-32).  These articles could have been invoked to oppose later enforcement of the Award in Indonesia unless waived.  By waiving in advance provisions that could later be invoked to block enforcement of the Award in an Indonesian court, the parties facilitated future enforcement efforts in Indonesia. (Id.).

effective choice of law by the parties to an arbitration agreement.[42] In the JOC and ESC, the parties presumptively chose Swiss procedural law as the lex arbitri when they designated Switzerland as the site of the arbitration, and that presumption is unrebutted.[43]

As the district court, another panel of this court, and the Hong Kong Court of First Instance have all recognized, Pertamina's previous arguments that Swiss arbitral law applied strongly evidence the parties' contractual intent.[44] Pertamina represented to the Tribunal that Swiss procedural law applied.[45] As but one example, Pertamina cited Swiss procedural law in arguing that the

---

[42] REST. (2D) CONFL. §§ 187, 188, & 218 (1971).

[43] Certain sections and comments of the Restatement also support a determination that Swiss law applied to the arbitration agreement. See, e.g. id. at § 188 (incorporating REST. (2D) CONFL. § 6, which requires consideration of the relevant policies of the forum); id. at § 218 cmt. b (suggesting that the arbitration forum may have the most significant relationship to the arbitration and that a contractual provision requiring arbitration to occur in a certain forum may evidence an intention by the parties that the local law of this forum should govern).

[44] Karaha Bodas Co., 335 F.3d at 371; Hong Kong decision at 12.

[45] See, e.g., Prelim. Award, § B(1) ("The Respondents support this conclusion by making reference to Swiss law as the JOC and the ESC provide for UNCITRAL Arbitration in Geneva between the parties which are neither Swiss nor Swiss resident. As a result, and under both contracts, the arbitration proceedings are governed by Chapter 12 of the Swiss Private International Law Statutes. Under Swiss law, [Respondent contends] the Arbitral Tribunal is lacking jurisdiction because KBC failed to comply with the contractual prerequisites to arbitration."); id. at § C(1) ("The Respondents also state that, under the arbitration agreements and Swiss law, the arbitrators have no power to consolidate . . . ."); id. at § C(3) (citing a Swiss federal tribunal case in support of its decision that a consolidated arbitration was appropriate); id. at § D(1) (Respondents contend that "[s]uch solution is not acceptable under the applicable Swiss law").

27

Tribunal could not consolidate the claims under the JOC and ESC into one proceeding. Pertamina at no point argued to the Tribunal that Indonesian procedural law applied. Pertamina initially sought to set aside the Award in a Swiss court.[46] Pertamina asked the Texas district court to stay its enforcement proceeding until Pertamina's appeal in Switzerland was resolved. In making this argument, Pertamina stated that "[t]he arbitration . . . was conducted according to the laws of Switzerland, and the Swiss court is empowered to vacate an award rendered in Switzerland . . . . KBC is asking this Court to act prematurely to confirm an award that might be overturned in the country whose law governed the arbitration."[47]

The Tribunal's decision that Swiss arbitral law applied does not make the Award unenforceable.[48] The combination of the parties' selection of Switzerland as the site of the arbitration; the

---

[46] In the district court, Pertamina presented an affidavit and report from an expert on international commercial arbitration that weakly attempted to explain the appeal to the Swiss court as a mistake. The theory that Pertamina's lawyers erred and applied to the wrong court for annulment – and then moved for reconsideration when that court dismissed the appeal – is utterly without support in the record.

[47] See Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001) (citations omitted) ("[I]f an 'arbitrator is even arguably construing or applying [a] contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'").

[48] Europcar Italia, 156 F.3d at 315; Nat'l Wrecking Co., 990 F.2d at 960; see Garvey, 532 U.S. at 509 ("Courts are not authorized to review [an] arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement.").

failure clearly or expressly to choose Indonesian arbitral law in their agreements, as required to select arbitral law other than that of the place of the arbitration; and the clear evidence provided by the parties' own conduct that they intended Swiss law to apply to the arbitration, amply supports the district court's determination that the Tribunal properly applied Swiss procedural law.

The district court also found that under the doctrine of judicial estoppel, Pertamina's prior conduct precluded it from arguing against the application of Swiss procedural law. The doctrine prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or earlier proceedings.[49] "The policies underlying the doctrine include preventing internal inconsistency, precluding litigants from 'playing fast and loose' with the courts, and prohibiting parties from deliberately changing positions according to the exigencies of the moment."[50] Fifth Circuit courts have identified two limitations on judicial estoppel: (1) the position of the party to be estopped must be clearly inconsistent with its

---

[49] Hall v. GE Plastic Pac. PTE Ltd., 327 F.3d 391, 396 (5th Cir. 2003); see In re Coastal Plains, Inc., 179 F.3d 197, 205 (5th Cir. 1999) (quoting Brandon v. Interfirst Corp., 858 F.2d 266, 268 (5th Cir. 1988)) (describing judicial estoppel as "a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position"); see also Ahrens v. Perot Sys. Corp., 205 F.3d 831, 833 (5th Cir. 2000); Ergo Sci., Inc. v. Martin, 73 F.3d 595, 598-600 (5th Cir. 1996).

[50] United States v. McCaskey, 9 F.3d 368, 378 (5th Cir. 1993).

prior position; and (2) the court must have accepted that prior position.[51] Judicial acceptance requires that the court adopted the position previously urged by a party, whether as a preliminary matter or as part of a final disposition.[52]

The district court did not abuse its discretion in imposing judicial estoppel to preclude Pertamina from arguing against the application of Swiss procedural law. Pertamina repeatedly represented to the Tribunal and to the district court that Swiss procedural law controlled the arbitration.[53] Both the Tribunal and the district court relied on these representations in their decisionmaking. In the Award, the Tribunal accepted Pertamina's argument that Swiss procedural law applied. The district court adopted Pertamina's position that Swiss law applied in delaying the enforcement proceedings pending the Swiss court's resolution of the appeal.[54] Pertamina's argument that Indonesian procedural law governed the arbitration is clearly inconsistent with its prior position that Swiss procedural law controlled.[55] Pertamina belatedly suggests that its positions are not inconsistent because

_____

[51] Hall, 327 F.3d at 396; Ahrens, 205 F.3d at 833; Coastal Plains, 179 F.3d at 206.

[52] Coastal Plains, 179 F.3d at 206.

[53] See note 24.

[54] See Coastal Plains, 179 F.3d at 206 (noting that the acceptance prong of judicial estoppel can be satisfied by a court's acceptance of a party's position "as a preliminary matter").

[55] See Hall, 327 F.3d at 396; Ahrens, 205 F.3d at 833; Coastal Plains, 179 F.3d at 206.

30

the New York Convention permits multiple primary jurisdictions. As addressed more fully below, this record makes it clear that only the Swiss courts had primary jurisdiction over this Award. Judicial estoppel provides an additional ground for concluding that Swiss procedural law applied to the arbitration proceeding.[56]

**C.    The Procedural Challenges to the Arbitral Award**

*1.    Consolidation of the Claims under the JOC and ESC into One Arbitration Proceeding*

Under Article V(1)(d) of the New York Convention, a court may refuse to enforce an arbitration award if "[t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place."[57]  Pertamina argues that because the JOC and ESC were separate contracts with separate arbitration clauses, and because neither contract expressly allowed the consolidation of claims, the Tribunal improperly consolidated the claims into one arbitration proceeding.   Pertamina also contends on appeal that because Indonesian rather than Swiss procedural law governed the

---

[56]   See Hall, 327 F.3d at 396; Coastal Plains, 179 F.3d at 206; Ahrens, 205 F.3d at 833.  The High Court of Hong Kong Court estopped Pertamina from asserting application of Indonesian procedural law for the same reasons.  Hong Kong decision at 9-12.  The High Court also emphasized the dilatoriness of Pertamina's argument:   "Pertamina's position on the [applicable procedural law] only changed 30 months after the preliminary award was published, 15 months after the Final award (December 2000) and seven months after the Swiss Court dismissed the petition for revision (August 2001)."  Id. at 11.

[57]   9 U.S.C. § 201, Art. V(1)(d).

arbitration, the Tribunal's reliance on Swiss procedural law to consolidate the claims was erroneous.

The Tribunal carefully analyzed the parties' contracts in concluding that a consolidated arbitration of KBC's claims against Pertamina and PLN under the JOC and ESC was appropriate. In factual findings set out in the Preliminary Award, the Tribunal set out the basis for concluding that the two contracts were integrated such that "the parties did not contemplate the performance of two independent contracts but the performance of a single project consisting of two closely related parties."[58] The Tribunal continued:

> In such circumstances, the conclusion of this Arbitral Tribunal is that KBC's single action should be admitted, provided it is appropriate. The Arbitral Tribunal has not the slightest doubt in this respect. Due to the integration of the two contracts and the fact that the Presidential Decrees, the consequences of which are at the origin of the dispute, affected both of them, the initiation of two separate arbitrations would be artificial and would generate the risk of contradictory decisions. Moreover, it would increase the costs of all the parties involved, an element of special weight in the light of difficulties faced by the Indonesian economy, to which counsel for [Pertamina]

---

[58] Article 15.3 of the ESC provided that "the terms of [the ESC] and the Joint Operation Contract constitute the entire agreement between the parties hereto." Article 1.2 of the JOC stated that "[e]ach such Energy Sales Contract shall be an integral part of this contract, and to the extent the provisions of the Energy Sales Contract obligate the parties hereto, shall be deemed incorporated into this contract for all purposes." Pertamina and KBC entered into the JOC and ESC on the same day. The JOC and the ESC contained virtually identical arbitration provisions.

32

legitimately drew the Arbitral Tribunal's attention.

The record provides ample support for the Tribunal's findings and conclusion that the two contracts were integrated such that the parties contemplated a single arbitration.

The Tribunal cited the Swiss law concept of "connexity" in analyzing the legal relations among KBC and Pertamina under the JOC and KBC, Pertamina, and PLN under the ESC as one of the factors justifying the consolidation of claims under the two contracts into one arbitration proceeding. The Tribunal concluded that the relationship of the JOC and ESC exceeded the standard of "connexity" under Swiss law. "The use of the word 'connexity' to describe the relationship between the JOC and the ESC would be an understatement. In reality, the two contracts are integrated." Courts and arbitration tribunals have recognized that claims arising under integrated contracts may be consolidated into single arbitrations.[59] The Tribunal cited one other factor that supported

---

[59] See, e.g., Conn. Gen. Life Ins. Co. v. SunLife Assur. Co. of Canada, 210 F.3d 771, 774 (7th Cir. 2000); Maxum Found., Inc. v. Salus Corp., 817 F.2d 1086, 1087-88 (4th Cir. 1987). Pertamina cites cases decided under the FAA and the law of different American jurisdictions for the proposition that courts do not have the authority to order arbitrations without the parties' approval. See, e.g., Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985) ("The preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation . . . ."); Gov't of the United Kingdom and N. Ireland v. Boeing Co., 998 F.2d 68, 74 (2d Cir. 1993); Protective Life Ins. Co. v. Lincoln Nat. Life Ins. Corp., 873 F.2d 281, 282 (11th Cir. 1989). These cases do not involve contracts so closely related as to manifest the parties' agreement to be joined in arbitration proceedings involving parties and claims under those integrated contracts.

consolidation: "appropriateness." The parties agreed to the application of the UNCITRAL Rules, which permit a tribunal to conduct an arbitration "in such manner as it considers appropriate."[60] Pertamina does not dispute the application of the UNCITRAL Rules to the arbitration proceeding.

Courts are reluctant to set aside arbitral awards under the New York Convention based on procedural violations, reflected in cases holding that the Convention embodies a proenforcement bias.[61] The Tribunal emphasized in its Preliminary Award that although the claims would be consolidated, "the position of each party has to be considered independently when discussing the substance of the case, on the basis of their respective legal and contractual situations." The record reflects that the Tribunal kept this promise. There is no prejudice arising from the consolidation that would justify a refusal to enforce the Award.

*2. The Composition of The Tribunal*

Under Article V(1)(d), a court may refuse enforcement of an arbitral award if the composition of the tribunal is not in

---

[60]  UNCITRAL Arbitration Rules at Art. 15(1).

[61]  See, e.g., China Minmetals Materials Imp. and Exp. Co., Ltd. v. Chi Mei Corp., 334 F.3d 274, 282-83 (3d Cir. 2003); Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114, 1120 (9th Cir. 2000); Alghanim, 126 F.3d at 20; Parsons & Whittemore Overseas, 508 F.2d at 973; Compagnie des Bauxites de Guinee v. Hammermills, Inc., 1992 WL 122712, at *5 (D.D.C. May 29, 1992); Am. Constr. Mach. & Equip. Corp. Ltd. v. Mechanised Constr. of Pakistan, Ltd., 659 F. Supp. 426, 428 (S.D.N.Y. 1987).

accordance with the parties' agreement.[62]  The JOC provided for the
appointment of arbitrators, as follows:

> Each Party [KBC and Pertamina] will appoint an
> arbitrator within thirty (30) days after the
> date of a request to initiate arbitration, who
> will then jointly appoint a third arbitrator
> within thirty (30) days of the date of the
> appointment of the second arbitrator, to act
> as Chairman of the Tribunal.  Arbitrators not
> appointed within the time limits set forth in
> the preceding sentence shall be appointed by
> the Secretary General of the International
> Center for Settlement of Investment Disputes.

The ESC procedure for arbitrators' appointment was slightly
different:

> PLN on one hand, and [KBC] and PERTAMINA, on
> the other hand, will each appoint one
> arbitrator, in each case within thirty (30)
> days after the date of a request to initiate
> arbitration, who will then jointly appoint a
> third arbitrator within thirty (30) days of
> the date of the appointment of the second
> arbitrator, to act as Chairman of the
> Tribunal.  Arbitrators not appointed within
> the time limits set forth in the preceding
> sentence shall be appointed by the Secretary
> General of the International Center for
> Settlement of Investment Disputes, upon the
> request of any Party.

Each contract required the appointment of arbitrators within thirty
days of the notice of arbitration and provided for appointment by
the ICSID in the event that a party did not do so.

In its notice of arbitration sent to Pertamina, KBC appointed
Professor Piero Bernardini to serve as an arbitrator.  Pertamina
did not designate an arbitrator within thirty days, nor did it

---

[62]  9 U.S.C. § 201, Art. V(1)(d).

object to KBC's selection at that time. By letter dated June 2, 1998, KBC notified the ICSID of Pertamina's inaction and requested the appointment of a second arbitrator under the default appointment provisions of the contracts. Pertamina did not respond to this letter. The ICSID questioned KBC about the consolidation of claims under the JOC and the ESC and KBC's unilateral appointment of an arbitrator. KBC responded by letter dated June 22, 1998. The ICSID confirmed receipt of KBC's letters and in a June 29, 1998 letter to all parties, recapped the prior correspondence, noted Pertamina's failure to respond, and expressed its intent to grant KBC's request to appoint the second arbitrator. The ICSID Secretary-General identified Dr. Ahmed El-Kosheri as its candidate and asked for any objections by July 13, 1998. The ICSID sent all the preceding correspondence to PLN by courier and to Pertamina by fax and courier. Despite the Secretary-General's invitation to do so, neither Pertamina nor PLN lodged objections or responses to the proposed appointment. On July 13, 1998, having received no communications from Pertamina, the ICSID notified Pertamina and PLN of its intent to appoint Dr. El-Kosheri and made the appointment on July 15, 1998. Under the JOC and ESC, Professor Bernardini and Dr. El-Kosheri then selected the chairman of the arbitration panel, Yves Derains.

In its Preliminary Award, the Tribunal rejected Pertamina's argument that KBC's selection of an arbitrator violated the ESC's requirement that KBC and Pertamina jointly make the nomination.

36

The Tribunal found that the parties intended to limit that requirement to disputes in which PLN was opposed to KBC and Pertamina. Because the ESC did not expressly address the method for appointing arbitrators when KBC and Pertamina opposed each other, the Tribunal found that UNCITRAL Arbitration Rules for appointment applied. The Tribunal ruled that the appointment procedures used did not violate these rules or create an inequality of treatment. The Tribunal emphasized Pertamina's failure to nominate an arbitrator or object to those nominated. The district court agreed with the Tribunal's reasoning and added that Pertamina had failed to demonstrate any prejudice from the appointment proceedings.

On appeal, Pertamina reasserts its argument that KBC's unilateral selection of an arbitrator violated the ESC's requirement that "PLN on the one hand and [KBC] and Pertamina, on the other hand, will each appoint one arbitrator." Pertamina contends that its interests would always be aligned with KBC under the ESC, which required PLN to purchase from Pertamina the electricity that KBC provided, and that this explains the contractual requirement that KBC and Pertamina agree on an arbitrator in a dispute arising under that contract. In response, KBC argues that the Tribunal correctly found that a dispute between KBC and Pertamina was possible under the ESC, but in the event of such a dispute, the ESC did not provide a procedure for choosing an arbitrator. KBC asserts that the Tribunal correctly found that the

37

general UNCITRAL rules for selecting an arbitrator would apply, under which KBC, Pertamina, and PLN would each appoint an arbitrator. In addition, KBC argues that the district court correctly found that Pertamina had failed to object to KBC's selection of Professor Bernardini as an arbitrator and failed to nominate an arbitrator despite the ICSID's requests. Finally, KBC argues that Pertamina cannot show prejudice that would make the Award unenforceable.

The ESC arbitration clause refers to "any dispute or difference of any kind whatsoever" arising among "the Parties." Section 2 of the ESC defines "parties" to include PLN, Pertamina, and KBC. By its terms, the arbitration clause covers a dispute between KBC and Pertamina arising under the ESC, as well as a dispute in which the interests of KBC and Pertamina are aligned. If the ESC required KBC and Pertamina jointly to select an arbitrator for disputes in which KBC and Pertamina were opposed, as Pertamina contends, Pertamina could effectively block arbitration under the ESC simply by refusing to agree with KBC to the selection of an arbitrator. Such an interpretation would make the ESC arbitration clause illusory. In addition, Pertamina had numerous opportunities early in the proceedings to object to KBC's selection of Professor Bernardini as an arbitrator and to nominate its own arbitrator. Pertamina did not challenge the composition of the arbitral panel until after the entire panel had been selected and seated. Pertamina's failure timely to object to Professor

38

Bernardini's selection and to nominate its own arbitrator was, as the district court noted, a strategic decision that Pertamina should not now be able to assert as a defense to enforcing the Award.[63]

Pertamina has failed to meet its burden of showing that the Tribunal was improperly constituted. The Tribunal reasonably interpreted the ESC's arbitration provisions and reasonably applied the UNCITRAL arbitration rules. Despite numerous opportunities, Pertamina failed to challenge the Tribunal's composition until after the arbitrators were selected. The procedural infirmities Pertamina alleges do not provide grounds for denying enforcement of the Award.

D.    The Due Process Challenges to the Arbitral Award

Under Article V(1)(b), enforcement of a foreign arbitral award may be denied if the party challenging the award was "not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present [its] case."[64] Article V(1)(b) "essentially sanctions the application of the forum state's standards of due process," in this case, United

---

[63]    Pertamina apparently argued to the Tribunal that it did not name an arbitrator because it was contesting the legitimacy of the arbitration and further contended that it did not receive certain correspondence from ICSID regarding KBC's request that the ICSID appoint a second arbitrator. Pertamina, however, did not make these arguments before the district court.

[64]    9 U.S.C. § 201, Art. V(1)(b).

States standards of due process.[65]  A fundamentally fair hearing requires that a party to a foreign arbitration be able to present its case.[66]  A fundamentally fair hearing is one that "meets 'the minimal requirements of fairness' – adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator."[67]  The parties must have an opportunity to be heard "at a meaningful time and in a meaningful manner."[68]  "The right to due process does not include the complete set of procedural rights guaranteed by the Federal Rules of Civil Procedure."[69]

### 1. The Claim that the Final Award "Reversed" the Preliminary Award

Pertamina first contends that the Tribunal reversed the Preliminary Award in the Final Award without notice, denying Pertamina the opportunity to be "meaningfully heard."  Pertamina emphasizes the Tribunal's ruling that "a governmental decision which prevents KBC [from] perform[ing] its obligations is not deemed to be a breach of contract by Pertamina or PLN but a Force

---

[65]  Iran Aircraft Indus. v. Avco Corp., 980 F.2d 141, 145 (2d Cir. 1992) (quoting Parsons & Whittemore Overseas, 508 F.2d at 975).

[66]  Slaney v. Int'l Amateur Athletic Fed'n, 244 F.3d 580, 592 (7th Cir. 2001); Generica, Ltd. v. Pharm. Basics, Inc., 125 F.3d 1123, 1130 (7th Cir. 1997).

[67]  Slaney, 244 F.3d at 592 (quoting Sunshine Mining Co. v. United Steelworkers, 823 F.2d 1289, 1295 (9th Cir. 1987)); Generica, 125 F.3d at 1130 (quoting same).

[68]  Iran Aircraft Indus., 980 F.2d at 146 (citations omitted).

[69]  Matter of Arbitration Between Trans Chem. Ltd. and China Nat. Mach. Imp. & Exp. Corp., 978 F. Supp. 266, 310 (S.D. Tex. 1997), aff'd, 161 F.3d 314 (5th Cir. 1998).

Majeure event excusing KBC's nonperformance."

The Tribunal stated in the Preliminary Award that the force majeure clause in the JOC and ESC made a "government-related event" an event of force majeure only with respect to KBC. The Tribunal stated that Pertamina and PLN were so closely related to the Indonesian government that a decision by the Indonesian government was not a force majeure event as to them. In its briefing before the Tribunal made its Final Award, KBC argued that under the contract language and given the close relationship between Pertamina and the Indonesian government, Pertamina bore the risk of loss from a force majeure event under the JOC and ESC. Pertamina responded that in the Preliminary Award, the Tribunal had ruled that acts of force majeure by the Indonesian government are not breaches of the JOC and ESC and that to award KBC damages would be incompatible with that ruling. In the Final Award, the Tribunal found that the Indonesian government's actions were an event of force majeure that excused KBC's failure to perform under the JOC and ESC. The Tribunal stated that this finding did not contradict its ruling in the Preliminary Award that the Indonesian government was not a party to the JOC or ESC, because that ruling "was not meant to express any view as to the consequences to Pertamina . . . of a Governmental decision which prevents the performance of the Contracts."

The record shows that Pertamina knew it could be found liable for nonperformance after the Preliminary Award had issued. After

41

the Preliminary Award issued, KBC argued to the Tribunal that Pertamina bore the risk of nonperformance under the JOC and ESC in the event of force majeure. KBC's argument clearly assumed that the Preliminary Award allowed the Tribunal to find that the contracts placed the risk of, and liability for, such nonperformance on Pertamina. In response to that argument, Pertamina had, and took, the opportunity fully to present its arguments against KBC's theory of liability.

The Final Award shows that the Tribunal considered and rejected Pertamina's argument in making its liability decision. The Tribunal concluded that the JOC and ESC allocated the risk of government interference with the project solely to Pertamina and PLN. In this enforcement proceeding, Pertamina is essentially repeating the arguments it made to the Tribunal. The fact that those arguments were presented to and considered by the Tribunal is inconsistent with Pertamina's claim that it had no notice of the need to make the argument to that Tribunal or the opportunity to do so. Pertamina did not suffer the fundamental unfairness it claims, so as to support a refusal to enforce the Award.[70]

> 2.    *The Tribunal's Denial of a Continuance and Request for Additional Discovery*

To challenge KBC's contention that FPL was willing to finance the project, Pertamina sought in the arbitration proceeding a

---

[70]    See Europcar Italia, 156 F.3d at 315 ("Absent extraordinary circumstances, a confirming court is not to reconsider the arbitrator's findings.").

continuance and discovery of the following documents from KBC, FPL, and Caithness regarding the financing of the KBC project:

> (1) All documents relating to efforts to obtain financing for the Karaha-Bodas project during the period September 1997 through June 1998.
>
> (2) All documents showing any consideration of providing direct financing (whether through bridge financing, a loan guarantee, or direct equity investment) for the Karaha-Bodas project during the period September 1997 through June 1998.
>
> (3) All documents relating to FPL's, its subsidiaries', or its predecessors' consideration of whether to invest in the Karaha-Bodas project.
>
> (4) All documents relating to FPL's, its subsidiaries', or its predecessors' decision to invest in the Karaha-Bodas project, stated variously to have occurred in mid-1996 or mid-1997.
>
> (5) All documents sent by KBC to FPL, its subsidiaries, or its predecessors following the investment identified in ¶ 4 and concerning geothermal exploration and development in the Karaha-Bodas concession area (whether such exploration occurred before or after the investment).
>
> (6) All documents relating to evaluation by each, any and all of KBC, FPL (or subsidiaries or predecessors), and Caithness whether to proceed with the Karaha-Bodas project during the period September 1997 through June 1998.

The Tribunal denied Pertamina's request.

After Pertamina discovered that FPL and certain other investors in KBC owned a political risk insurance policy underwritten by Lloyd's of London, which had paid $75 million after

43

the project suspension, Pertamina sought reconsideration of the district court's summary judgment enforcing the Award under Rule 60(b).  The district court found that Pertamina's inability to introduce evidence of the insurance policy at the arbitration did not prevent the presentation of its case to the Tribunal.  The district court also held that KBC's failure to bring the insurance policy to the Tribunal's attention did not make enforcing the Award a violation of public policy.  We agree.

"An 'arbitrator is not bound to hear all of the evidence tendered by the parties . . . .  [He] must give each of the parties to the dispute an adequate opportunity to present its evidence and arguments.'"[71]  It is appropriate to vacate an arbitral award if the exclusion of relevant evidence deprives a party of a fair hearing.[72] "Every failure of an arbitrator to receive relevant evidence does not constitute misconduct requiring vacatur of an arbitrator's award.  A federal court may vacate an arbitrator's award only if the arbitrator's refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings."[73]

---

[71] Generica, 125 F.3d at 1130 (quoting Hoteles Condado Beach, La Concha and Convention Ctr. v. Union de Tronquistas Local 901, 763 F.2d 34, 39 (1st Cir. 1985)); see Slaney, 244 F.3d at 592 (cautioning that "parties that have chosen to remedy their disputes through arbitration rather than litigation should not expect the same procedures they would find in the judicial arena").

[72] Generica, 125 F.3d at 1130; Slaney, 244 F.3d at 592.

[73] Hoteles Condado Beach, 763 F.2d at 40 (internal citations omitted).

44

Although the Tribunal denied Pertamina the specific discovery it sought on the issue of FPL financing, Pertamina was able to cross-examine the KBC witnesses who testified that FPL was willing to provide financing for the project, Leslie Gelber and Robert McGrath. Before those witnesses testified, Pertamina had already presented substantial evidence in its response to KBC's Statement of Claim as to why KBC would not have been able to secure financing for the project, emphasizing the depressed state of the Indonesian economy and its unattractiveness to investors. Pertamina argued to the Tribunal that KBC had presented no documentary evidence of FPL's willingness to finance the project and asserted that FPL would have required such a high rate of interest because of the risk involved as to make the KBC venture unprofitable.

The Tribunal found that "the issue remained open in 1998 of the terms and conditions upon which financing could have been obtained for the Project development." The Tribunal noted that "the worsening of the economic and political situation in Indonesia at the time has to be taken into account as regards both the conditions at which financing could have been obtained and possible delays in arranging the same." The Tribunal, however, noted that the parties contemplated the possibility of a delay in arranging financing, because the ESC provided that the contract could be suspended for up to two years if KBC was unable to arrange financing for the project. The Tribunal also noted KBC's efforts to reinstate the project after the initial government suspension

45

order, finding that KBC was ready and willing to secure financing for the project. The Tribunal found the testimony of KBC's witnesses on financing credible, stating that it had "no reason . . . to cast doubts about KBC's readiness, directly and/or through its shareholders, to make provision thereof." In determining the lost profits, the Tribunal considered all the risks of the project, including the potential difficulties in arranging financing that Pertamina cited, and "significantly reduc[ed]" the amount of lost profits claimed by KBC.

In Generica, Ltd. v. Pharmaceutical Basics, Inc.,[74] the party opposing enforcement of an international arbitration award argued that the tribunal curtailed cross-examination of a witness, in violation of the party's due process right to present its case.[75] The tribunal, recognizing that it had curtailed the cross-examination, placed diminished reliance on the witness's testimony.[76] The court found that by limiting the reliance on the witness's testimony, the arbitrators eliminated the possibility of prejudice to the party claiming a due process violation.[77] The court confirmed the award.[78] As in Generica, the Tribunal appears to have given all the evidence as to damages, including the

---

[74] 125 F.3d 1123 (7th Cir. 1997).

[75] Id. at 1129-31.

[76] Id. at 1131.

[77] Id.

[78] Id.

46

availability of financing, appropriate weight in determining liability and damages.

In Tempo Shain Corp. v. Bertek, Inc.,[79] the arbitral panel did not allow a potential witness to testify on the basis that the witness's testimony was cumulative.[80] The court vacated the arbitral award.[81] The record showed that the witness would have testified to facts that only he could have known, making his testimony essential.[82] Similarly, in Hoteles Condado Beach, La Concha and Convention Center v. Union de Tronquistas Local 901,[83] the court vacated an award because the arbitral panel refused to give any weight to the only evidence available to the losing party.[84] In the present case, by contrast, the Tribunal's language in the Final Award and the record show that the testimony about FPL's willingness to provide financing was only one factor relevant to damages. KBC raised the possibility of FPL's direct financing only in response to Pertamina's affirmative defense that KBC could not have financed the project. Pertamina did not seek discovery on KBC's efforts to finance the project in the arbitration proceeding until after KBC filed its rebuttal to the response to the Statement

---

[79] 120 F.3d 16 (2d Cir. 1997).

[80] Id. at 20.

[81] Id. at 21.

[82] Id. at 20.

[83] 763 F.2d 34 (1st Cir. 1985).

[84] Id. at 40.

47

of Claim, despite the fact that Pertamina raised the issue as an affirmative defense.

The record shows that the Tribunal's refusal to grant a continuance and additional prehearing discovery did not "so affect the rights of [Pertamina] that it may be said that [it] was deprived of a fair hearing."[85] Pertamina was able to present comprehensive evidence of investment conditions in Indonesia and expert opinions on the availability of financing, as well as cross-examine Gelber and McGrath on FPL's asserted willingness and ability to provide financing.[86]

Pertamina contends that the late revelation of the political risk insurance policy refutes KBC's contention in the arbitration that FPL was willing to finance KBC to protect the $40 million it had previously invested in KBC. The existence of the political insurance policy was not "central or decisive" to Pertamina's case.[87] In order to show damages, KBC had to show that if the project had not been suspended, KBC could have proceeded to perform

---

[85] Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co., 397 F.2d 594, 599 (3d Cir. 1968).

[86] Pertamina acknowledges that it specifically examined Gelber and McGrath about the existence of documents regarding FPL's willingness to finance the project. Pertamina states that the Tribunal had to instruct McGrath to answer the question directly, demonstrating that McGrath was an "evasive" witness. The Tribunal observed McGrath testify and was able to make the credibility judgment that he either lacked knowledge of such documents or was unwilling to discuss them. Cf. United States v. Garza, 118 F.3d 278, 283 (5th Cir. 1997) (noting that a district court is in the best position to judge the credibility of witnesses and refusing to "second-guess" the lower court's judgment on the issue).

[87] Cf. Hoteles Condado Beach, 763 F.2d at 40 (denial of party's only evidence was ground for vacating award).

by obtaining financing.  The record amply supports KBC's position that KBC and FPL had already invested substantial money before the Indonesian government issued its suspension order.  The existence of the political risk insurance policy is not inconsistent with the testimony of Gelber and McGrath that FPL intended to finance the project and would have done so but for the suspension decreed by the government of Indonesia.  The existence of political risk insurance for the project is not inconsistent with FPL's willingness to invest had the project not been suspended, that is, if the risk insured against had not occurred.  The Tribunal's damages analysis and the lost profits award depended on the assumption that the project continued, that is, that the suspension had not taken place.

Pertamina's argument that KBC's political risk insurance policy undermines the Tribunal's finding that the JOC and ESC placed the risk of a government-related event on Pertamina is also unavailing.  The Tribunal determined that the JOC and ESC placed the risk of nonperformance due to a government-related event on Pertamina based on a well-reasoned, detailed analysis of the contract terms.[88]  The existence of a political risk policy does not

---

[88]  See, e.g., Talman Home Fed. Sav. & Loan Ass'n of Ill. v. Am. Bankers Ins., 924 F.2d 1347, 1351 (5th Cir. 1991) (quoting Republic Nat'l Bank of Dallas v. Nat'l Bankers Life Ins. Co., 427 S.W.2d 76, 79 (Tex. App. – Dallas 1968, writ ref'd)) ("The cardinal rule of construction as applied to all contracts is to ascertain the intention of the parties as expressed in the language used in the instrument itself.  It is the intention and purpose of contracting parties, as disclosed within the four corners on the instrument which should control.").

undermine this result. Moreover, the political risk policy contained a subrogation provision that required KBC to reimburse the insurer if KBC recovered its losses from another source.[89] The existence of the political risk policy is not inconsistent with the contractual allocation of risk.

The Tribunal asked McGrath whether FPL had purchased "OPIC insurance," a form of political risk insurance. McGrath responded that he did not know the answer to the question. Pertamina's counsel did not follow up on the Tribunal's questioning. At the conclusion of the hearing, the Tribunal chair asked the parties whether the discovery requests were "maintained, all of them, part of them, because we would like to know on what we have to decide." The response from counsel for Pertamina was as follows:

> [T]he purpose of discovery is to prepare for the hearing, it is not to supplement the record after the hearing. So I think the discovery requests are moot, and if discovery is now permitted, then you have to re-open the proceedings and so on. So I treated, notwithstanding the fact that it was theoretically open, I treated this request as effectively being denied, and we went forward.

---

[89] This subrogation provision undermines Pertamina's additional argument that, in the alternative, it is entitled to a $75 million offset from the political risk insurance payout. Pertamina argues that enforcement of the judgment, in combination with the insurance proceeds, will permit KBC double recovery in violation of the single-satisfaction rule. See Tompkins v. Cyr, 202 F.3d 770, 785 (5th Cir. 2000). The subrogation provision of the political risk insurance policy, however, requires that to the extent the insured obtains any recovery from a judgment against Pertamina, the insured is obligated to repay the insurer. In addition, payment by a collateral source does not typically diminish a judgment debt. See Global Petrotech, Inc. v. Engelhard Corp., 58 F.3d 198, 202 (5th Cir. 1995). There will be no double recovery, and Pertamina is not entitled to a credit.

> Our request went to the purported financial
> ability, the purported financing that would
> have been made available and other things, and
> I think the record on that has been fully
> made. I am prepared to rest on that record,
> and so I think the discovery requests should
> no longer be in the picture.

The parties submitted extensive posttrial briefs. In the Final Award, issued in December 2000, the Tribunal stated that all parties had "waived their respective requests for discovery" at the conclusion of the hearing.

Pertamina asserts that it did not waive its requests for discovery because the Tribunal denied the request before the hearing, when the discovery could have been of use. Pertamina ignores the fact that in international commercial arbitration, it is not uncommon to ask for additional discovery or information after a hearing, to request additional sessions of a hearing to submit more evidence, or to file posthearing submissions.[90] Rather than renew its requests for discovery into FPL's willingness to finance the project or to assert a request for discovery into FPL's political risk insurance, Pertamina's counsel expressly stated that

---

[90] See, e.g., UNCITRAL Arbitration Rules at Art. 15(2), 29(2) (stating that a party may request at any stage of the proceeding a hearing for presentation of evidence and that a tribunal may reopen hearings at any time upon request of a party); Jay E. Grenig, Alternative Dispute Resolution with Forms, § 5.76 (2d ed. 1997) (including in a description of the customary order of arbitration proceedings the "submission of post-hearing briefs"). See also Lincoln Nat'l Life Ins. Co. v. Payne, 286 F.Supp.2d 1023, 1026 (S.D. Ia. 2003); Techcapital Corp. v. Amoco Corp., 2001 WL 267010, at * 2 (S.D.N.Y. March 19, 2001); Mays v. Lanier Worldwide, Inc., 115 F.Supp.2d 1330, 1342 (M.D. Ala. 2000); I. Appel Corp. v. Katz, 1999 WL 287370, at * 3 n.2 (S.D.N.Y. May 6, 1999); United Foods, Inc. v. W. Conference of Teamsters Pension Trust Fund, 816 F. Supp. 602, 607 (N.D. Ca. 1993).

the record had been "fully made" and that he was "prepared to rest on the record." The record supports the Tribunal's conclusion that the discovery requests made before the hearing had been waived. Pertamina did not ask for discovery into political risk insurance until it filed its Rule 60(b) motion in the district court.

The Tribunal's denial of a continuance and additional discovery did not prevent Pertamina from presenting its case, so as to deprive it of a fair hearing. Pertamina presented ample evidence in support of its position that KBC would be unable to find financing. The Tribunal considered Pertamina's evidence and gave it considerable weight, awarding KBC damages substantially lower than the amount it sought.[91] Pertamina has failed to show the prejudice required to decline enforcement of the Award on this ground.

### 3. The District Court's Denial of Pertamina's Rule 56(f) Discovery Request

In the district court, after KBC moved for summary judgment on its application to enforce the Award, Pertamina moved for a continuance under Rule 56(f) and sought the same discovery on FPL's willingness and ability to provide project financing that it had sought in the arbitration. The district court denied the Rule 56(f) motion.

---

[91] KBC sought $512.5 million in lost profits. The Tribunal awarded KBC $150 million in lost profits. The Tribunal also awarded KBC $111.1 million in lost expenditures.

The denial of a Rule 56(f) discovery request is reviewed for abuse of discretion.[92] The district court may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts.[93] "If it appears that further discovery will not produce evidence creating a genuine issue of material fact, the district court may, in the exercise of its discretion, grant summary judgment."[94] As one court has explained:

> In judging discovery requests in this context [of an arbitration award confirmation proceeding], the court must weigh the asserted need for hitherto undisclosed information and assess the impact of granting such discovery on the arbitral process. The inquiry is an entirely practical one, and is necessarily keyed to the specific issues raised by the party challenging the award and the degree to which those issues implicated factual questions that cannot be reliably resolved without some further disclosure.[95]

The record shows that in the arbitration, Pertamina was able to present substantial evidence regarding the Indonesian economy, the problems in securing financing for projects in Indonesia, and the projected electrical generating capacity of the project. The Tribunal took Pertamina's arguments into account in awarding

---

[92] Resolution Trust Corp. v. Sharif-Munir-Davidson Dev. Corp., 992 F.2d 1398, 1401 (5th Cir. 1993).

[93] Int'l Shortstop v. Rally's, Inc., 939 F.2d 1257, 1267 (5th Cir. 1991).

[94] Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1442 (5th Cir. 1993).

[95] Lummus Global Amazonas S.A. v. Aguaytia Energy del Peru S.R. Ltda., 256 F.Supp.2d 594, 626 (S.D. Tex. 2002) (citations omitted).

significantly less in lost profits than KBC had sought. The Tribunal did not solely rely on FPL's willingness to finance the project in determining that KBC was ready to "directly, and/or through its shareholders," finance the project. The Tribunal also looked to KBC's efforts to convince the Indonesian government to restart the project in making this finding. The record supports the district court's denial of a continuance to permit further discovery on KBC's ability to finance the project.

The district court also noted Pertamina's counsel's statement at the conclusion of the arbitration hearing that "the record on [the financing issue] ha[d] been fully made." Pertamina has failed to show that the discovery it sought in the district court would have created disputed fact issues material to determining whether Pertamina received a fundamentally fair hearing before the Tribunal.[96] Because the issue of financing could be reliably resolved without the requested discovery, the district court did not abuse its discretion in denying Pertamina's Rule 56(f) motion.[97]

---

[96] See Krim, 989 F.2d at 1442.

[97] See Lummus Global Amazonas, 256 F.Supp.2d at 626; Resolution Trust Corp., 992 F.2d at 1401. For the same reasons, the district court did not err by refusing to permit additional discovery or host an evidentiary hearing before ruling on Pertamina's Rule 60(b) motion. See Provident Life and Accident Ins. Co. v. Goel, 274 F.3d 984, 999 (5th Cir. 2001) (noting that the only issues on an appeal of a Rule 60(b) motion are the propriety of the denial of relief and whether the district court abused its discretion in denying relief).

**E. The Public Policy Challenge to the Arbitral Award**

Pertamina asserts that the Award violated public policy because it violated the international law doctrine of abuse of rights. Pertamina contends that the Award imposes punishment for obeying a government decree. Pertamina also asserts that KBC's failure to disclose the political risk insurance policy during the arbitration makes enforcement of the Award a violation of public policy.

Under Article V(2)(b) of the New York Convention, a court may refuse to recognize or enforce an arbitral award if it "would be contrary to the public policy of that country."[98] The public policy defense is to be "construed narrowly to be applied only where enforcement would violate the forum state's most basic notions of morality and justice."[99] "The general pro-enforcement bias informing the convention . . . points to a narrow reading of the public policy defense."[100] Erroneous legal reasoning or misapplication of law is generally not a violation of public policy within the meaning of the New York Convention.[101]

---

[98] 9 U.S.C. § 201, Art. V(2)(b).

[99] M & C Corp., 87 F.3d at 851 n.2 (quoting Fotochrome, Inc. v. Copal Co., Ltd., 517 F.2d 512, 516 (2d Cir. 1975)); see Parsons & Whittemore Overseas, 508 F.2d at 974; Slaney, 244 F.3d at 593.

[100] Parsons & Whittemore Overseas, 508 F.2d at 973.

[101] Coutinho Caro & Co. U.S.A., Inc. v. Marcus Trading, Inc., 2000 WL 435566, at *12 (D. Conn. March 14, 2000).

An action violates the abuse of rights doctrine if one of the following three factors is present:  (1) the predominant motive for the action is to cause harm; (2) the action is totally unreasonable given the lack of any legitimate interest in the exercise of the right and its exercise harms another; and (3) the right is exercised for a purpose other than that for which it exists.[102]  The abuse of rights doctrine is not established in American law[103] and KBC's actions do not meet the factors required to trigger its application.  The evidence in the record is that KBC pursued the arbitration to recover its costs, expenses, and lost profits from the nonperformance of the JOC and ESC.[104]  The record does not support Pertamina's argument that enforcing the Award penalizes obedience to a governmental decree.  The Tribunal explained in the Final Award that the JOC and ESC shifted the risk of loss resulting from a government-ordered suspension onto Pertamina and PLN.  Pertamina is challenging the substance of the Tribunal's interpretation of the JOC and ESC.  An arbitration tribunal's contract interpretation does not violate public policy unless it "violates the most basic notions of morality and justice."[105]  The

---

[102]  Joseph M. Perillo, Abuse of Rights: A Pervasive Legal Concept, 27 Pac. L. J. 37, 47 (Fall 1995).

[103]  The abuse of rights doctrine is not even fully established in Louisiana, the American jurisdiction that has invoked it.  See Lloyd v. Georgia Gulf Corp., 961 F.2d 1190, 1193 n.4 (5th Cir. 1992).

[104]  See Perillo, 27 Pac. L. J. at 47.

[105]  Slaney, 244 F.3d at 593.

Tribunal's interpretation of the JOC and ESC does not approach this steep threshold.

KBC's failure to disclose the political risk insurance policy does not provide a basis for refusing to enforce the Award. Enforcement of an arbitration award may be refused if the prevailing party furnished perjured evidence to the tribunal or if the award was procured by fraud.[106] Courts apply a three-prong test to determine whether an arbitration award is so affected by fraud: (1) the movant must establish the fraud by clear and convincing evidence; (2) the fraud must not have been discoverable upon the exercise of due diligence before or during the arbitration; and (3) the person challenging the award must show that the fraud materially related to an issue in the arbitration.[107] It is not necessary to establish that the result of the arbitration would have been different if the fraud had not occurred.[108] Courts, however, have held that an arbitration award is not fraudulently obtained when the protesting party had an opportunity to rebut his opponent's claims at the hearing.[109]

---

[106] Karppinen v. Karl Kiefer Mach. Co., 187 F.2d 32, 34 (2d Cir. 1951).

[107] Bonar v. Dean Witter Reynolds, Inc., 835 F.2d 1378, 1383 (11th Cir. 1988).

[108] Id.

[109] See Biotronik Mess-Und Therapiegeraete GmbH & Co. v. Medford Med. Instrument Co., 415 F. Supp. 133, 137-38 (D.N.J. 1976).

In <u>Biotronik Mess-Und Therapiegeraete GmbH & Co. v. Medford Medical Instrument Co.</u>,[110] the party opposing enforcement of the award argued that the prevailing party knowingly withheld evidence of an agreement that undermined its case.[111]  The court stated that while the party opposing enforcement urged fraud, the real complaint was that the party prevailing in the arbitration should have presented evidence favorable to its opponent's case.[112]  The court rejected this argument, stating that "a party cannot complain about the nonproduction of evidence when it failed to offer such evidence itself."[113]  In <u>Catz American Co. v. Pearl Grange Fruit Exchange Inc.</u>,[114] the party opposing enforcement did not ask the arbitrators to bring certain witnesses before the panel, although the prevailing party offered to make the witnesses available.[115] The panel never called for the witnesses' testimony.[116]  The party opposing enforcement of the award argued that the prevailing party should nonetheless have produced the witnesses.[117]  The court rejected this argument, stating that "[a]rbitrators must be given

---

[110]   415 F. Supp. 133 (D.N.J. 1976).

[111]   <u>Id.</u> at 137.

[112]   <u>Id.</u> at 138.

[113]   <u>Id.</u>

[114]   292 F. Supp. 549 (S.D.N.Y. 1968).

[115]   <u>Id.</u> at 553.

[116]   <u>Id.</u>

[117]   <u>Id.</u>

discretion to determine whether additional evidence is necessary or would simply prolong the proceedings."[118]  Because the witnesses were not solely within the prevailing party's control and there was other evidence in the record supporting the other party's position, the court rejected the challenge to the award.[119]

Pertamina argues that KBC's failure to reveal its political risk insurance policy amounts to misconduct warranting a refusal to enforce the Award.  There is no evidence in the record that KBC deliberately misled the Tribunal.  When the question of political risk insurance arose and was not clearly resolved, Pertamina had the opportunity to ask additional questions, which it chose not to pursue.  The Tribunal gave Pertamina an opportunity to pursue discovery requests, which it declined.  KBC's failure to produce evidence of political risk insurance, given Pertamina's decisions not to pursue the subject, does not violate public policy.  The district court did not err in refusing to deny enforcement of the Award on the basis of a public policy violation or in refusing to grant a new trial on the basis of Rule 60(b).[120]

### F. The Effect of the Indonesian Court's Annulment of the Arbitral Award

---

[118]  Id.

[119]  Id.

[120]  Cf. Biotronik, 415 F. Supp. at 138; Catz American, 292 F. Supp. at 553; see Goel, 274 F.3d at 999 (noting that the only issues on an appeal of a Rule 60(b) motion are the propriety of the denial of relief and whether the district court abused its discretion in denying relief).

Pertamina filed an annulment action in the Central District Court of Jakarta, Indonesia in March 2002. That court annulled the Award on August 27, 2002. Pertamina now contends that the Indonesian court's annulment is a defense to enforcement under the New York Convention. KBC responds that Indonesia cannot be a proper forum for annulment because Switzerland is the country of primary jurisdiction.

Pertamina argues that the New York Convention permits more than one country to have primary jurisdiction over an arbitration award. Pertamina contends that the Convention's language permitting annulment by a court in "the country in which, or under the law of which, that award was made" allows for two potential primary jurisdiction countries – the country who hosted the arbitration proceeding, and the country whose arbitral procedural law governed that proceeding.[121] Using this reasoning, Pertamina suggests that both Switzerland (the host country) and Indonesia (the country of governing law) have primary jurisdiction over the arbitration in this case.

Pertamina correctly observes that the Convention provides two tests for determining which country has primary jurisdiction over an arbitration award: a country in which an award is made, and a

---

[121] The language, "'the competent authority of the country . . . under the law of which, that award was made' refers exclusively to procedural and not substantive law, and more precisely, to the regimen or scheme of arbitral procedural law under which the arbitration was conducted, and not the substantive law . . . applied in the case." Int'l Standard Elec. Corp., 745 F. Supp. at 178; see Alghanim, 126 F.3d at 21; M & C Corp., 87 F.3d at 848.

country under the law of which an award is made.[122]  The New York Convention suggests the potential for more than one country of primary jurisdiction.  Courts and scholars have noted as much.[123] Pertamina cites one such scholar as support for its position:

> [A]mbiguity is derived from the fact that the formula does not indicate whether the party seeking the annulment of the award must choose between the court at the seat of the arbitration and the one located in the country under the law of which the award is made – if the two are distinct – or whether it may seek annulment jointly or alternatively before both courts. . . . Article V(1)(e) of the New York Convention could [ ] be construed as referring to the courts of only one country while giving the party seeking the annulment the possibility to choose between the two countries should the two be distinct.[124]

Although an arbitration agreement may make more than one country eligible for primary jurisdiction under the New York Convention, the predominant view is that the Convention permits only one in any given case.[125]  "[M]any commentators and foreign courts have concluded that an action to set aside an award can be brought <u>only</u>

---

[122]  9 U.S.C. § 201, Art. V(1)(e).

[123]  <u>See, e.g.</u>, <u>Int'l Standard Electric Corp.</u>, 745 F. Supp. at 177 (quoting Albert Jan van den Berg, <u>The New York Arbitration Convention of 1958</u> 350 (Kluwer 1981)); Paul Sanders, <u>The New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards</u>, 6 Netherlands Int'l L. Rev. 43, 56 (1956).

[124]  Hamid G. Gharavi, <u>The International Effectiveness of the Annulment of An Arbitral Award</u> (2002).

[125]  "The reality, however, seems to be that the Article V(1)(e) formula enables enforcement courts to refuse enforcement of an award annulled by the competent court of the country in which the award was made even if (i) the award was rendered pursuant to the laws of a third State and (ii) annulment proceedings were pending before the court of the country under the law of which the award was made."  <u>Id.</u>

under the domestic law of the arbitral forum."[126]  Pertamina's expert on international arbitration filed a report in the district court, stating that "there can be only one country in which the courts have jurisdiction over an annulment."[127]  In its motion to the district court to set aside judgment under Rule 60(b), Pertamina conceded that "[a] primary jurisdiction has exclusive authority to nullify an award on the basis of its own arbitration law."  Such "exclusive" primary jurisdiction in the courts of a single country is consistent with the New York Convention's purpose; facilitates the "orderliness and predictability" necessary

---

[126]  <u>Alghanim</u>, 126 F.3d at 22 (citing commentary that the country of origin of the award is the only country with primary jurisdiction).

[127]  Supplemental Expert Report of Albert Jan van den Berg, p. 20. Others agree.  Professor Paul Sanders concludes that regardless of any ambiguity, Article V(1)(e) grants primary jurisdiction to the courts of only a single country:

> [T]he suspension must have been ordered by or the application for suspension must have been made to a "competent authority of the country in which, or under the law of which, that award was made." Here only one competent authority is meant; either the Court of the country where the award was made, or the Court of the country under the law of which the award was made.  These last words were added on a Russian proposal to cover the case that an award has been made f.i. in Germany under French procedural law.  In that case the suspension . . . according to the Convention should have to be demanded in France and not in Germany.

Sanders, <u>New York Convention</u> at 56.  In his expert report for KBC, Professor Allen Scott Rau emphasized that "there is <u>only one national court system that has jurisdiction to consider an application for annulment of an award</u>."  Scholar Jan Paulsson submits "the fact is that setting aside awards under the New York Convention can take place only in the country in which the award was made."  <u>The Role of Swedish Courts in Transnational Commercial Arbitration</u>, 21 Va. J. Int'l L. 211, 242 (1981).

to international commercial agreements; and implements the parties' choice of a neutral forum.[128]

In this case, both of the New York Convention criteria for the country with primary jurisdiction point to Switzerland – and only to Switzerland.[129]  The Award was made in Switzerland and was made under Swiss procedural law.  The parties' arbitration agreement designated Switzerland as the site for the arbitration.  This designation presumptively designated Swiss procedural law as the lex arbitri, in the absence of any express statement making another country's procedural law applicable.

Pertamina's own conduct during and after the arbitration evidences its intent to have Swiss procedural law apply and to have

---

[128]  For example, "having a double test, i.e. that of the place of arbitration and that of the law governing the arbitration, can give rise to discrepancies."  Andreas Bucher and Pierre-Yves Tschanz, International Arbitration in Switzerland 164 (1988).  As one source has explained:

> For instance, the Federal Republic of Germany does not define German awards as awards made in Germany but as awards governed by German law wherever they are made.  As a result, an award purporting to be made in Switzerland under German arbitration law is considered as a Swiss award in Switzerland and as a German award in Germany, with the result that such award could be challenged in both countries.  In the reverse situation of an award made in Germany purportedly under Swiss arbitration law, such award is considered as Swiss in Germany and as German in Switzerland (since the place of arbitration is in Germany).  As a result, such an award cannot be challenged in either country, but can only be recognized (or denied recognition) under the New York Convention.

Id.

[129]  See Alghanim, 126 F.3d at 21; M & C Corp., 87 F.3d at 848.

Switzerland be the country of primary jurisdiction over the Award. During the arbitration, Pertamina asserted that Swiss procedural law applied. When it lost the arbitration, Pertamina asked the Swiss court to set aside the Award, acknowledging that the Swiss courts had primary jurisdiction. While that appeal was pending, Pertamina urged the district court in the enforcement proceeding that the Swiss court had exclusive primary jurisdiction – until the Swiss courts rejected Pertamina's appeal.[130]

Under the New York Convention, the parties' arbitration agreement, and this record, Switzerland had primary jurisdiction over the Award.[131] Because Indonesia did not have primary jurisdiction to set aside the Award, this court affirms the district court's conclusion that the Indonesian court's annulment ruling is not a defense to enforcement under the New York Convention.

### III. Conclusion

Pertamina's challenges to the district court's decision affirming the Award are without merit. The summary judgment enforcing the Award is AFFIRMED.

---

[130] The district court found that Pertamina "specifically, repeatedly and unequivocally" argued that Swiss arbitration law applied in the arbitration. See note 24.

[131] The Hong Kong court enforced the Award after the Indonesian court issued its annulment ruling, stating that "the fact that the court in Indonesia has now annulled the award under its own law is also a matter which has no effect on this court's task." Hong Kong decision at 12.